## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| NATIONAL ASSOCIATION for the ADVANCEMENT of MULTIJURISDICTION PRACTICE (NAAMJP), RICHARD H. ROSARIO, PAUL J. RIVIERE, Plaintiffs<br><br>vs.<br><br><br>HON. CHIEF JUSTICE RONALD D. CASTILLE, HON. THOMAS G. SAYLOR, HON. J. MICHAEL EAKIN, HON. MAX BAER, HON. DEBRA McCLOSKEY TODD, HON. SEAMUS P. McCAFFERY, HON. CORREALE F. STEVENS Defendants, | CIVIL ACTION NO<br><br>COMPLAINT FOR INJUNCTIVE & DECLARATORY RELIEF TO ABROGATE & ENJOIN Pa. B.A.R. 204 THAT CATEGORICALLY DISQUALIFIES ADMISSION ON MOTION PRIVILEGES TO NON-RECIPROCITY SISTER-STATE ATTORNEYS UNDER:<br>1. ARTICLE IV. SECTION 2 PRIVILEGES AND IMMUNITIES CLAUSE<br>2. DORMANT COMMERCE CLAUSE<br>3. FIRST AMENDMENT<br>4. EQUAL PROTECTION |

## INTRODUCTION

1. The injustice in this case can be understood by analogy. Assume the owner of the Philadelphia Eagles wants to retain the best quarterback. He chooses either San Francisco 49er Colin Kaepernick or Baltimore Raven Joe Flacco to be his quarterback, the representative face of his franchise. Both quarterbacks are available free agents wanting to play for the Eagles. In America — our pledge of

allegiance is "one nation, under God, indivisible, with liberty and justice for all." Joe Flacco and Colin Kaepernick are free to play for the Eagles, or the Pittsburgh Steelers, or any other professional football team.   But if they are lawyers by profession, they cannot play or represent clients in the Keystone State under Pa. B.A.R. 204.   The sole reason they are denied the Privileges and Immunities of American citizenship is because they come from non-reciprocity states.   If lawyers Kaepernick and Flacco, however, are from 38 other states and the District of Columbia that Pennsylvania has reciprocity with, they can practice law in Pennsylvania.   But since they come from one of the 12 non-reciprocity states, and although they are admittedly otherwise qualified, they are deprived of their citizenship rights by Pa. B.A.R. 204, injuring them, and depriving Pennsylvania citizens of their professional services.   Plaintiffs assert Pa. B.A.R. 204 in practical effect is unlawful retaliation, arbitrary and irrational serving no legitimate state interest, archaic, and unconstitutional.

## JURISDICTION AND VENUE

2.  This Court has jurisdiction under 28 U.S.C. § 1331. Venue is appropriate as defendants' office is in Philadelphia, Pennsylvania.

## PARTIES

3.  Plaintiff NATIONAL ASSOCIATION for the ADVANCEMENT OF MULTIJURISDICTION PRACTICE (NAAMJP) is a public benefit corporation

organized under California law with offices in Los Angeles.  Plaintiff, like other corporations such as in *Citizens United v. Federal Election Commission*, 130 S.Ct. 876 (2010) (holding corporations have First Amendment rights), is engaged in interstate commerce and advocacy throughout the United States for the purpose of improving the legal profession, by petitioning for admission on motion in the dwindling minority of jurisdictions that have not yet adopted the ABA's recommendations for reciprocal admission for all lawyers. "An association can bring claims on behalf of its members." *See Summers v. Earth Island Inst*., 555 U.S. 488, 494, (2009);  *New Jersey Physicians, Inc. v. President of US*, 653 F. 3d 234, 241 (3rd Cir. 2011)  The NAAMJP also asserts association and third-party standing because many of its members, want to remain anonymous for many reasons.  Many members are African-American, Hispanic, and women. These NAAMJP members have been handicapped and deprived of their constitutional rights under color of State law by Rule 204's overbroad presumption that they are categorically ineligible for admission on motion privileges in Pennsylvania.

4. Plaintiff RICHARD H. ROSARIO is a member of the NAAMJP, a graduate of ABA accredited law school, a well-qualified lawyer in good standing admitted to the bar of the Maryland Court of Appeals by examination in 1992, and to the bar of the District of Columbia by examination in 1994.  Mr. ROSARIO specializes in representing banks and financial institutions in real estate matters.

Mr. ROSARIO applied for Pennsylvania admission on motion in the past, but was ruled categorically ineligible under Pa. B.A.R. 204 solely because more than fifty percent of his practice is in Maryland, a non-reciprocity state.  It would be futile for Mr. ROSARIO to again apply for reciprocity under Pa. B.A.R. 204 because nothing has changed since he was rejected.   He continues to be injured by Rule 204, and if the rule is changed he will again apply for admission on motion in the Keystone State.

5. Plaintiff PAUL RIVIERE is a member of the NAAMJP, a graduate of ABA accredited law school, a lawyer in good standing admitted to the bar of the New Jersey Supreme Court by examination in July 2008.   He has travelled interstate and lived in many states.  His offices are in New Jersey approximately 50 miles from Pennsylvania.  He has a substantial federal bankruptcy practice, and he has many clients who do business in both Pennsylvania and New Jersey. Both RIVIERE and his clients are disabled by his not being able to represent them in the Keystone State. He is otherwise qualified for reciprocal admission under Pa. B.A.R. 204 except that New Jersey is a non-reciprocity state. He will apply for reciprocal admission on motion if Rule 204 is changed.

6. The defendants are the very Hon. Chief Justice RONALD D. CASTILLE, and the Hon. Pennsylvania Supreme Court Associate Justices: THOMAS G. SAYLOR, J. MICHAEL EAKIN, MAX BAER, DEBRA McCLOSKEY TODD,

SEAMUS P. McCAFFERY, and.  CORREALE F. STEVENS.  These Honorable Justices are sued in their official capacity for prospective injunctive and declaratory relief under the *Ex Parte Young, 209 U.S. 123, 159-160 (1908)* exception to Eleventh Amendment immunity.  *Accord Koslow v. Commonwealth of Pennsylvania*, 302 F. 3d 161, 168 (3rd Cir. 2002).

## FACTS

7.   National studies by Microsoft and the National Association for Law Placement, reported on December 10-11, 2013 by the American Bar Association Journal and National Law Journal, conclude that African-Americans and Hispanics make up 8.4% of our nation's lawyers and 25% of the U.S. workforce.  Minority women make up just .2.26% of law firm partners.  These studies reveal the "diversity gap" in other fields is substantially less, and this diversity gap in large part is due to structural headwinds caused by minorities not passing bar exams, while 96.7% of whites pass. This "diversity gap" is reinforced by Pa. B.A.R. 204.

8. The American Bar Association has twice in this 21st Century carefully studied and recommended the identical relief Plaintiffs have petitioned for in this case.  The ABA MJP Commission (2002) and ABA Ethics 20-20 Commission (2012) studies were undertaken because of continually evolving technology, client demands and a national (as well as global) legal services marketplace have fueled an increase in cross-border practice as well as a related need for lawyers to relocate

to new jurisdictions.  These ABA studies are undertaken by renowned attorneys from all over the United States, holding public hearings, receiving  comments from all arms of the public and bar, before reaching its recommendations, which are then submitted for further comment, and eventually to a 500 member ABA House of Delegates for approval or rejection.

9. The US Supreme Court has held professional norms articulated by the American Bar Association are "(s)tandards to which we have referred as 'guides to determining what is reasonable.'" *Wiggins v. Smith*, 539 US 510, 524 (2003).  The ABA determined that over 40,000 lawyers in the last five years have been admitted on motion in 39 states and the District of Columbia. The ABA entered a factual finding that there was no evidence that these lawyers were a threat to the public or needed to take another bar exam. [1] The ABA squarely recommends that in light of ever increasing advances in technology that all states should adopt bar admission

---

[1] "The Commission also found unpersuasive the concern that passage of the bar examination is necessary to demonstrate knowledge of the law of the jurisdiction in which the lawyer is seeking admission. As explained above, more than 65,000 lawyers have obtained admission by motion in the last ten years, and there is no evidence from disciplinary counsel or any other source that these lawyers have been unable to practice competently in the new jurisdiction or have been unable to identify and understand aspects of the new jurisdiction's law that differ from the law of the jurisdiction where those lawyers were originally admitted. The Commission also concluded that the "local law" concern rests on the incorrect assumption that passage of the bar examination demonstrates competence in local law. In fact, an increasing number of jurisdictions use the Uniform Bar Examination, which typically does not require any knowledge of local law. And in jurisdictions that do test local law, the local law portion of the test is usually sufficiently small that bar passage does not turn on it."

on motion for lawyers with three years of experience.  The 20/20 Commission "found no reason to believe that lawyers who have been engaged in the active practice of law for three of the last seven years will be any less able to practice law in a new jurisdiction than a law school graduate who recently passed the bar." The ABA concluded the failure to have admission on motion injures the public and the profession; women lawyers are further disproportionately injured.

10. These ABA judgments are game-changers because they demolish the dogma experienced attorneys should take a second licensing exam — much like the myths that blacks were inferior, women were witches, and that literacy tests were necessary to vote— were superseded by cultural advances stemming from science and better evidence.

11. The ABA further squarely recommends abolishing "you get reciprocity if we get reciprocity" restraints[2] like Pa. B.A.R. 204. The ABA MJP Commission (2002) and 20/20 Commissions (2012) necessarily presumed — if by law, a layman is presumed to know the law, or can presumptively find it, and is presumptively capable of representing herself — *a fortiori* an experienced licensed attorney can do the same.  The hypothesis that a layman is presumptively competent, while on the other hand, an experienced lawyer is presumptively

---

[2] "The Commission believes that such varied additional restrictions only serve to sustain outdated and parochial purposes at a time when the relevance of borders to the competent practice of law has and will continue to erode."

incompetent is implausible and irrational.   The ABA essentially concluded, in accordance with the Constitution of the United States, that if all men are created equal, then all lawyers are created equal.

12. The ABA has also obviously considered Supreme Court precedent. There is a presumption "that the lawyer is competent to provide the guiding hand that the defendant needs" applies even to young and inexperienced lawyers in their first jury trial and even when the case is complex. *United States v. Cronic*, 466 U. S. 648, 658, 664 (1984);  *See* also *Supreme Court of Virginia v. Friedman*, 487 U.S. 59 (1988)(holding admission on motion is a constitutionally protected Privilege and Immunity, and the Supreme Court will not presume that non-resident attorneys or citizens are not fully qualified for bar admission on motion).

13.  Another game changer in reciprocal bar admission is the Uniform Bar Examination (UBE), which was created and pioneered by the National Conference of Bar Examiners (NCBE).[3]  The NCBE developed the UBE in an effort to create uniformity between the various legal bar examinations administered by the states.[4] "Law schools are teaching a national curriculum. The Uniform Bar Examination

---

[3] http://www.ncbex.org/assets/media_files/UBE/ABA-Uniform-Bar-Exam-2010-Council-9-14-v2-3.pdf

[4] http://www.abajournal.com/magazine/article/one_for_all_uniform_bar_exam_picking_up_steam/

(UBE) recognizes that trend. In addition, lawyers are relocating more frequently."[5]
The UBE is intended to facilitate lawyer mobility across jurisdictional lines.

14. Bedford T. Bentley*, a member of the UBEC, in referencing the *ABA MacCrate Commission* (1992) has concluded that *one bar exam is more than enough* as they do not test nine out of ten fundamental lawyer skills.[6]

15. "A bar exam is a test of minimum competence to practice law." See Rebecca White Berch, "The Case for the Uniform Bar Exam, "*The Bar Examiner*, Feb 2009 p. 12 The purpose of this licensing test is public protection. The ABA and UBEC *have concluded that one bar exam is more than enough*. The ABA concluded the best evidence of minimum competence and public protection is actual experience in practicing law. The UBEC concluded that even novice attorneys should not have to take a second licensing test.

16. *The Standards for Educational and Psychological Testing* (1999) (Published by the American Educational Research Association, American Psychological Association, and the National Council on Measurement in

---

[5] Arizona State Bar Board of Governors: September Meeting Review (Sept. 2010).
[6] Robert MacCrate is the distinguished former chairman of the ABA's "Task Force on Law Schools and the Profession" (1992). The well-regarded "MacCrate Report" describes the skills and virtues necessary to be an effective lawyer. The "MacCrate Report" identifies ten fundamental lawyering skills:
(1) problem solving, (2) legal analysis and reasoning, (3) legal research, (4) factual investigation,
(5) communication, (6) counseling, (7) negotiation,
(8) litigation and alternative dispute resolution, (9) the organization and management of legal work, (10) professional self-development.

Education) (Standards) were developed "to provide criteria for the evaluation of tests, testing practices, and the effects of test use." *Id.*  at p. 2. "When tests are at issue in legal proceedings and other venues requiring expert witness testimony it is essential that professional judgment be based on the accepted corpus of knowledge in determining the relevance of particular standards in a given situation.  The intent of the Standards is to offer guidance for such judgments." *Id*. at 4.

17. The *Standards* also emphasize that evaluating acceptability (of a test) involves (a) professional judgment that is based on a knowledge of behavioral science, psychometrics, and the community standards in the professional field to which the tests apply; (b) the degree to which the intent of the standard has been satisfied by the test developer and user; (c) the alternatives that are readily available; and (d) research and experimental evidence regarding feasibility of meeting the standard." *Id*. at 4.

18.  Plaintiffs aver that Rule 204's requirement that experienced attorneys from non-reciprocity states should be required to take another bar exam violate the legal industry licensing standards established by the ABA and UBEC.

19.  Plaintiffs aver that Rule 204's requirement that experienced attorneys from 12 non-reciprocity states should be required to take another bar exam violate industry standards as nine of ten fundamental lawyering skills are not tested on a bar exam.

20.  Plaintiffs aver that Rule 204's requirement that experienced attorneys from 12 non-reciprocity states should be required to take another bar exam violate the legal industry licensing standards because it is well known in testing circles that "Study after study has shown that it is almost impossible to get judges to agree on scores for essay answers."   *See* Geoff Norman, "So What Does Guessing the Right Answer Out of Four Have to Do With Competence Anyway?" *The Bar Examiner*, p. 21 (Nov 2008).  Dr. Geoff Norman is a nationally recognized testing expert with over 30 years of experience.  He is an expert's expert, writing a chapter in the *Cambridge Handbook of Expertise and Expert Performance*.  (Cambridge University Press 2007)

21. Plaintiffs aver that Rule 204's requirement that experienced attorneys from 12 non-reciprocity states should be required to take another bar exam violate the legal industry licensing standards because it is well known in testing circles that expertise and expert performance is a product of experience. Dr. Michelene Chi was Professor in the Psychology Department Cognitive Program at the University of Pittsburgh. She is now at Arizona State University.  Dr. Chi is an expert's expert, writing two chapters in the *Cambridge Handbook of Expertise and Expert Performance, supra*.  Dr. Chi writes "Experienced experts surpass novices, those new to a profession, in seven major ways: (a) generating the best solution; (b) pattern recognition; (c) qualitative analysis; (d) self-monitoring skills in terms

of their ability and knowing what they do not know; (e) choosing appropriate strategies; (f) seeing and exploiting opportunities; and (g) cognitive effort, meaning they work faster, with less effort, and greater control." *Id*. at 27.

22. Dr. Gary Klein echoes these cognitive findings about "experts and expert performance" in Chapter 10 "The Power to See the Invisible" of his book *Sources of Power: How People Make Decisions* (The MIT Press 1999). Dr. Klein explains "There are many things experts can see that are invisible to everyone else: (i) Patterns that novices do not notice; (ii) Anomalies – events that did not happen and other violations of expectancies; (iii) The big picture (situation awareness); (iv) The way things work; (v) Opportunities and improvisations; (vi) Events that either already happened (the past) or are going to happen (the future); (vii) Differences that are too small for novices to detect; (viii) Their own limitations." *Each of these is virtually invisible to novices*. (Emphasis added). "(E)xperts see the world differently. They see things the rest of us cannot. Often experts do not realize that the rest of us are unable to detect what seems obvious to them." Dr. Klein sees a relationship between expertise and age, and "the accumulation of experience does not weigh people down; it lightens them up."

23. This correlation between experience and expertise is often euphemistically recognized as the 10,000 hour rule.[7]

24. Plaintiffs aver that Rule 204's requirement that experienced attorneys from 12 non-reciprocity states should be required to take another bar exam violate the legal industry licensing standards because the American Bar Association's recommendation for reciprocal licensing is reinforced by the science of complexity. The *diversity prediction theorem*, (sometimes known as the wisdom of the crowd) means that it is a mathematical fact that all of the States licensing tests combined will always be more accurate in predicting entry level competence than any individual state's licensing test. The *diversity trumps ability* theorem holds that differences in how people represent problems (*perspectives*), in the techniques that they use to find solutions (*heuristics*), in how they categorize events (interpretations), and in the models that they use to anticipate (*predictive models*) contribute to our collective ability to locate better solutions to problems, to make more accurate predictions, and to respond to changing circumstances.

25. Less than 0.4% of attorneys admitted to practice law in Pennsylvania were the subject of disciplinary actions.[8]  In many of those cases, the punishments handed down were informal admonitions or private reprimands.[9]

---

[7] Malcolm Gladwell, *Outliers* (Little Brown 2008) "Chapter 2 The 10,000 -- Hour Rule"

26. Plaintiffs aver that Rule 204's tit-for-tat retaliation injures Plaintiffs and Pennsylvania citizens for no other reason other than to satisfy an evolutionarily hardwired desire to retaliate against other States showing disrespect to Pennsylvania lawyers by not providing them reciprocity.

### FIRST CAUSE OF ACTION
### VIOLATION OF THE ARTICLE IV SECTION 2
### PRIVILEGES AND IMMUNITIES CLAUSE

26. *In re Lockwood,* 154 US 116 (1894), Belva A. Lockwood was admitted to practise (sic) law in the Supreme Court of the District of Columbia, and the bars of several States of the Union. The Virginia Supreme Court rejected her

---

[8] *American Bar Association* Online, (http://www.americanbar.org/content/dam/aba/migrated/marketresearch/PublicDocuments/lawyer_count_by_state_20012011_1.authcheckdam.pdf) (2012). (As of October 2011, Pennsylvania had approximately 48,492 attorneys admitted to the Pennsylvania State Bar and residing in the state.) *See also Supreme Court of Pennsylvania*, Disciplinary Board Online (2012) (http://www.padisciplinaryboard.org/newsroom/statistics/) (noting that in 2010 approximately 160 attorneys admitted to practice law in Pennsylvania were subject to attorney discipline proceedings. That number rose by thirty-three (33) attorneys in 2011.)

[9] *Supreme Court of Pennsylvania*, Disciplinary Board Online (2012) (http://www.padisciplinaryboard.org/newsroom/statistics/) (noting that in 2010 punishments ranged from Informal Admonitions all the way up to Disbarment. Fifty-five (55) attorneys received Informal Admonitions and sixteen (16) received private reprimands. Only eight attorneys received Probation, while only two were subject to Public Censures. The harshest of the punishments, Disbarment, was handed out to forty-five (45) attorneys, while thirty-four Pennsylvania attorneys received Suspension from the practice of law. In 2011 seventy-five (75) attorneys received Informal Admonitions and nineteen (19) were Privately Reprimanded. Fifteen (15) attorneys received Probation, while only three (3) were subject to Public Censures. Moreover, forty-nine (49) attorneys were Suspended, while thirty-two were Disbarred.)

application for admission because she was a woman, citing *In Bradwell v. The State*, 16 Wall. 130 (1873), where the Supreme Court "held that the right to practise (sic) law in the state courts was not a privilege or immunity of a citizen of the United States."

27. Twenty years earlier, in *Bradwell*, a woman was denied the right to practice law by the State of Illinois. A concurring opinion emphasized,

> "The paramount destiny and mission of woman are to fulfil (sic) the noble and benign offices of wife and mother. This is the law of the Creator. And the rules of civil society must be adapted to the general constitution of things, and cannot be based upon exceptional cases." *Id*. 141-42

*28. Lockwood* and *Bradwell* are obviously antiquated, but they show the history of our law.

29. In the seminal case *Supreme Court of New Hampshire v. Piper*, 470 U.S. 274 (1985), the Supreme Court held,

> The lawyer's role in the national economy is not the only reason that the opportunity to practice law should be considered a "fundamental right." We believe that the legal profession has a noncommercial role and duty that reinforce the view that the practice of law falls within the ambit of the Privileges and Immunities Clause.[fn11] Out-of-state lawyers may — and often do — represent persons who raise unpopular federal claims. In some cases, representation by nonresident counsel may be the only means available for the vindication of federal rights. *Id*. at 281-82.

*30.* The inextricably intertwined First Amendment freedoms to speech/advocate, associate, and petition are cabined adjacent to the freedom of the

press.   *Piper* recognizes there is no First Amendment difference between the constitutional duty of a lawyer to petition and a newspaper to publish.

31. More particularly, *Supreme Court of Virginia v. Friedman*, 487 U.S. 59 (1988) squarely holds that bar admission on motion for sister-state attorneys is a constitutionally protected Privilege and Immunity.  Virginia argued Ms. Friedman could take the bar examination, and thus the Clause was not offended. The Court rejected this contention stating, "The issue instead is whether the State has burdened the right to practice law, a privilege protected by the Privileges and Immunities Clause, by discriminating among otherwise equally qualified applicants solely on the basis of citizenship or residency.  We conclude it has."  *Id*. at 67.  The norm under the Privileges and Immunities Clause is comity, i.e. equal treatment.   The Supreme Court stated, "we see no reason to assume that nonresident attorneys who, like Friedman, seek admission to the Virginia bar on motion will lack adequate incentives to remain abreast of changes in the law or to fulfill their civic duties." *Id*. at 69.

32. In *Piper* and *Friedman*, the New Hampshire and Virginia Supreme Courts proffered various reasons to justify their challenged bar admission policies. It was argued out-of-state lawyers will be less familiar with local law; they will not be available for scheduled hearings and pro bono work; they will be less concerned with their professional responsibilities; it will be too difficult to supervise the

ethics of a nation-wide bar; and admission on motion is discretionary and does not come within the ambit of the Privileges and Immunities Clause. The Supreme Court rejected every justification as insubstantial. It further recognized that many of the States have put up barriers primarily to protect their own lawyers from professional competition, which is not a legitimate state interest. See *Supreme Court of New Hampshire v. Piper*, *supra*, 470 U.S. at 285 n. 18 (1985)("The Privileges and Immunities Clause was designed primarily to prevent such economic protectionism.")

33. As in *Friedman*, Rule 204 discriminates among otherwise equally qualified sister-state attorneys in bar admission on motion, and it is thus unconstitutional. Rule 204 further offends the constitution because it provides the Plaintiffs in this 21st Century the same archaic privileges and immunities provided to blacks and women in the 19th Century.

## SEDOND CAUSE OF ACTION
## VIOLATION OF THE DORMANT COMMERCE CLAUSE

34. The preceding allegations are incorporated by reference.

35. In *Goldfarb v. Virginia State Ba*r, 421 U.S. 773, 792 (1975) the Supreme Court found that legal services affected interstate commerce and the delivery of legal services were subject to regulation under the Commerce Clause.

36. The Supreme Court has recognized that lawyer competition in the market place of ideas and commerce makes everyone better. See *FTC v. Superior Court Trial Lawyers Assn*. (1989) 493 U.S. 411,

> "(U)ltimately competition will produce not only lower prices, but also better goods and services.' *National Society of Professional Engineers v. United States*, 435 S. 679, 695 (1978). This judgment 'recognizes that all elements of a bargain — quality, service, safety, and durability — and not just the immediate cost, are favorably affected by the free opportunity to select among alternative offers.'" *Trial Lawyers*, *supra*, 493 U.S. at 423.
> . . .
> "That is equally so when the quality of legal advocacy rather, than engineering design, is at issue." *Id*. at 424.

37. The reciprocity question presented in this case was asked and answered in *Great Atlantic & Pacific Tea Co. v. Cottrell*, 424 US 366 (1976),

> "The question presented … is whether Mississippi, consistently with the Commerce Clause, Art. I, § 8, cl. 3, of the Constitution,[2] may, pursuant to this regulation, constitutionally deny a Louisiana milk producer the right to sell in Mississippi milk satisfying Mississippi's health standards solely because the State of Louisiana has not signed a reciprocity agreement with the State of Mississippi as required by the regulation." *Id*. at 368. The U.S. Supreme Court held, "The reciprocity clause thus disserves rather than promotes any higher Mississippi milk quality standards. Therefore this is a case where the "burden imposed on [interstate] commerce is clearly excessive in relation to the putative local benefits." *Ibid*.

38. Likewise, Pennsylvania's Rule 204 retaliation and requirement of complete re-testing for experienced attorneys is clearly excessive in relation to the putative local benefit. The ABA has repeatedly concluded that the failure to have reciprocal admission for experienced attorneys injures the public and the legal

profession.  Economic protection is not a legitimate state interest. *Piper*,  470 U.S. at 285 n. 18 (1985).

39. Rule 204 is per se unconstitutional because it directly regulates interstate commerce unevenly since it allows and disqualifies certain experienced attorneys from admission on motion privileges and providing interstate legal services depending on prior state licensing.  As such, Rule 204 is per se invalid violating of the Dormant Commerce Clause.

## THIRD CAUSE OF ACTION
## RULES 204(2) AND 204(4) VIOLATE THE FIRST AMENDMENT

40. The preceding allegations are incorporated by reference.  The operations of the courts and the judicial conduct of judges are matters of utmost public concern. *Landmark Communications, Inc. v. Virginia*, 435 U.S. 829, 839 (1978). Litigation is a form of political expression. *In re Primus*, 436 U.S. 412, 428.  The First Amendment protects "litigation [as] a means for achieving the lawful objectives of equality by all government." *NAACP v. Button*, 371 U.S. 415, 429 (1963).  It is thus a form of political expression. *Ibid.* "It is no answer to the constitutional claims … that the purpose of these regulations was merely to insure high professional standards and not to curtail free expression." *Id*. at 438-39. Regulations and practices that unjustifiably obstruct the availability of professional

representation or other aspects of the right of access to the courts are invalid. *Procunier v. Martinez*, 416 U.S. 396, 419 (1974).

**A.     Rule 204 is Substantially Overbroad**

41. A state law may be deemed constitutionally invalid if it is substantially overbroad. *Broadrick v. Oklahoma*, 413 U.S. 601 (1973).   A government regulation is substantially overbroad if it suppresses substantially more speech than necessary to achieve its goal.   *Id.* at 612.   The tit-for-tat condition precedent in Rule 204 chills more speech than necessary by categorically excluding all lawyers from 12 non-reciprocity States, as does the five year requirement.   It is not narrowly tailored as there is no evidence that experienced attorneys licensed in 12 non-reciprocity jurisdictions are a threat to Pennsylvania citizens, but that lawyers licensed in 38 states are not a threat to the public.

42. This categorical disqualification from admission on motion of all experienced attorneys from all non-reciprocity jurisdictions is patently overbroad, not narrowly tailored, and therefore unconstitutional.

**B.     Rule 204 is An Unconstitutional *Prior Restraint***

43. Prior restraints on First Amendment rights are presumptively unconstitutional. *Southeastern Promotions, Ltd. v. Conrad*,  420 U.S. 546, 558, (1975). In its simple, most blatant form, a prior restraint is a law which requires submission of speech to an official who may grant or deny permission to utter or

publish it based upon its contents. *Alexander v. United States*, *supra*, 509 U.S. 544,

556 . ( KENNEDY dissenting)

44. In *Citizens United v. Federal Election Com'n*, *supra*, 558 U.S. 310, 130

S. Ct. 876, 891 (2010), the corporation was barred from publishing its view in a

film about Hilary Clinton.   *Piper* makes clear that lawyers have a constitutional

duty similar to the press.   The First Amendment freedoms to advocacy, association,

petition, and press are inextricably intertwined. In *Citizens United* the Court

affirmed:

> "**These onerous restrictions thus function as the equivalent of prior restraint by giving the FEC power analogous to licensing laws implemented in 16th- and 17th-century England, laws and governmental practices of the sort that the First Amendment was drawn to prohibit**. See *Thomas v. Chicago Park_Dist.,* 534 U.S. 316, 320, 122 S.Ct. 775, 151 L.Ed.2d 783 (2002); *Lovell v. City of Griffin,* 303 U.S. 444, 451-452, 58 S.Ct. 666, 82 L.Ed. 949 (1938); *Near, supra,* at 713-714, 51 S.Ct. 625. Because the FEC's "business is to censor, there inheres the danger that [it] may well be less responsive than a court—part of an independent branch of government—to the constitutionally protected interests in free expression." *Freedman v. Maryland,* 380 U.S. 51, 57-58, 85 S.Ct. 734, 13 L.Ed.2d 649 (1965). When the FEC issues advisory opinions that prohibit speech, "[m]any persons, rather than undertake the considerable burden (and sometimes risk) of vindicating their rights through case-by-case litigation, will choose simply to abstain from protected speech—harming not only themselves but society as a whole, which is deprived of an uninhibited marketplace of ideas." 130 S.Ct. at 895-96.  (Emphasis added)

45. The Supreme Court held these FEC prior approval regulations on their

face chilled the corporation's speech.

46. In the same way, requiring experienced attorneys to obtain prior approval by reinventing the wheel by passing another licensing exam with highly subjective tests — "functions as a prior restraint analogous and equivalent to the licensing of printing presses in the 16th and 17th Century." *Ibid*.  The ABA has recommended abolishing licensing tests for experienced attorneys.  It made a factual finding that the failure of States to provide reciprocal admission on motion for experienced attorneys injures the public. Study after study demonstrates that it is almost impossible to get judges to agree on a score for essay tests. According to the ABA *MacCrate* Report[10]  nine out of ten fundamental lawyer skills and virtues necessary to practice law are not measured  on a bar exam, including: problem solving, legal research, factual investigation, communication,   counseling, negotiation, litigation and alternative dispute resolution,   the organization and management of legal work, and professional self-development. It also does not measure a lawyer's constitutional duty to champion locally unpopular causes and vindicate federal rights. Hence, requiring experienced attorneys from disfavored states to pass another licensing test is not analogous to requiring blacks to take a literacy test in order to vote.

---

[10] Robert MacCrate is the distinguished former chairman of the ABA's "Task Force on Law Schools and the Profession" (1992).

**47**. Rule 204's categorical distinction and differential treatment of attorneys from reciprocity jurisdictions and those who are not restrains Plaintiffs from exercising their right to engage in speech in a public forum concerning matters of public concern. Therefore, Rule 204 is unconstitutional and invalid as a prior restraint.

### C.    Rules 204(2) & 204(4) Constitute Unlawful Content and Viewpoint Discrimination

**48**. The Supreme Court has recognized that the basic analysis under the First Amendment has not turned on the motives of the legislators, but on the effect of the regulation. *Young v. American Mini Theaters*,   427 U.S.  50, 78 (1975) The true motive behind the creation and adoption for Rule 204 does not change the First Amendment analysis; it is its effect that we must look to in determining its constitutionality.

**49**. "A regulation that denies one group of citizens the right to address a selected audience on controversial issues of public policy is plainly viewpoint discrimination." *Consolidated Edison Co. v. Public Serv. Comn'n*, 447 U.S. 530, 546 (1980). "Viewpoint discrimination is thus an egregious form of content discrimination." *Rosenberger v. Rector and Visitors of Univ. of Va.*, 515 US 819, 829 (1995); *Perry Ed. Assn. v. Perry Local Educators' Assn.*, 460 U. S. 37, 46 (1983). "To permit one side of a debatable public question to have a monopoly in expressing its views is the antithesis of constitutional guarantees." *Madison Joint*

*School Dist. No. 8 v. Wisconsin Employment Relations Comm'n*, 429 U.S. 167, 175-176 (1976).  "A law or policy permitting communication in a certain manner for some but not for others raises the specter of content and viewpoint censorship. This danger is at its zenith when the determination of who may speak and who may not is left to the unbridled discretion of a government official." *Lakewood v. Plain Dealer Publishing Co*, 486 U.S. 750, 763 (1988).

50. Rule 204 allows attorneys from reciprocity states to obtain a license and petition the courts and speak; whereas, it categorically prohibits attorneys from non-reciprocity states the same precious freedoms.  Rule 204 is not a time, place, and manner restriction because it is not viewpoint and content neutral.[11]  Rule 204 permits licensing and debate by one group of otherwise qualified experienced attorneys while denying another group of otherwise qualified attorneys the same precious freedoms.  Therefore, Rule 204 is content and viewpoint discrimination

51.   Moreover, distinctions in the right to exercise First Amendment freedoms are subject to strict scrutiny.  In *Citizens United v. Federal Election Commission*, 130 S.Ct. 876, (2010), the Court held:

---

[11] To be upheld as a constitutional time, place or manner restriction a permit requirement applying to First Amendment activity must "(1) be content-neutral, (2) be narrowly tailored to serve a significant government interest, and (3) leave open ample alternative channels of expression." *Ward v. Rock Against Racism*, 491 U.S. 781, 789-90 (1989). The tit-for-tat restrictions are not time, place or manner restrictions because they are not content neutral.

Quite apart from the purpose or effect of regulating content, moreover, the Government may commit a constitutional wrong when by law it identifies certain preferred speakers. By taking the right to speak from some and giving it to others, the Government deprives the disadvantaged person or class of the right to use speech to strive to establish worth, standing, and respect for the speaker's voice. The Government may not by these means deprive the public of the right and privilege to determine for itself what speech and speakers are worthy of consideration. The First Amendment protects speech and speaker, and the ideas that flow from each. *Id*. at 890

…

Any effort by the Judiciary to decide which means of communications are to be preferred for the particular type of message and speaker would raise questions as to the courts' own lawful authority. Substantial questions would arise if courts were to begin saying what means of speech should be preferred or disfavored. *Id*. at 890

52. The basic premise underlying the Court's ruling in *Citizens United* is the proposition that the First Amendment bars regulatory distinctions based on a speaker's identity, including its "identity" as a corporation. *Id*. at 930 (Justice Stevens in dissent). Courts, too, are bound by the First Amendment. *Id*. at 891.

53. Rule 204 makes differential licensing distinctions based on a speaker's identity as a member of a favored or disfavored state bar. The hypothesis that a layman is presumptively competent to represent themselves, unless he or she is mentally ill, while on the other hand, Plaintiff experienced lawyers from non-reciprocity states are presumptively incompetent makes no sense. It is content and viewpoint discrimination. Therefore, Rule 204 is unconstitutional.

**D.**     **Rule 204 Constitutes Compelled Association that Abridges the First Amendment Right of Freedom of Association on Its Face and As Applied**

54. "The Court has recognized a right to associate for the purpose of engaging in those activities protected by the First Amendment — speech, assembly, petition for the redress of grievances, and the exercise of religion." *Roberts v. United States Jaycees*, 468 U.S. 609, 618 (1984). The Court has long recognized that, because the Bill of Rights is designed to secure individual liberty, it must afford the formation and preservation of certain kinds of highly personal relationships a substantial measure of sanctuary from unjustified interference by the State. *Ibid.* "Moreover, the constitutional shelter afforded such relationships reflects the realization that individuals draw much of their emotional enrichment from close ties with others. Protecting these relationships from unwarranted state interference therefore safeguards the ability to independently define one's identity that is central to any concept of liberty." *Ibid.* An individual's freedom to speak, to worship, and to petition the government for the redress of grievances could not be vigorously protected from interference by the State unless a correlative freedom to engage in a group effort toward those ends were not also guaranteed. *Id.* at 622. Government actions that may unconstitutionally infringe upon this freedom can take a number of forms. Among other things, government may seek to impose

penalties or withhold benefits from individuals because of their membership in a disfavored group. *Ibid*.

55. The right to associate also includes a right *not* to associate. *Roberts v. United States Jaycees*, *supra*, 468 U.S. at 622. Here, as in *Roberts*, Rule 204 imposes penalties and withholds privileges based solely on plaintiffs' licensing in disfavored non-reciprocity jurisdictions. As such, the Pennsylvania Supreme Court bears the burden of proving the validity of the admission on motion rule, which it cannot meet because the U.S. Supreme Court has already held that admission on motion is a constitutionally protected Privilege and Immunity. *Supreme Court of Virginia v. Friedman, supra*, 487 U.S. 59 (1998). Therefore, Rule 204 is invalid as it abridges Plaintiffs' right to associate.

### E.     Rule 204 Violates the First Amendment Right to Petition

56. In *Professional Real Estate Investors, Inc. v. Columbia Pictures Industries, Inc.*, 508 U.S. 49 (1993), the Court in construing the right to petition held that litigation could only be enjoined when it is a sham. To be a sham, first, it must be objectively baseless in the sense that no reasonable litigant could expect success on the merits; second, the litigant's subjective motive must conceal an attempt to interfere with the business relationship of a competitor …through the use of government process  — as opposed to the outcome of that process — as an anti-competitive weapon. *Id*. at 60-61.

57. Rule 204 violates the Petition Clause because it arbitrarily and irrationally presumes that the Plaintiffs, and all experienced lawyers from non-reciprocity states, will file sham petitions for an anti-competitive purpose, and only file sham petitions for an anti-competitive purpose unless they take another entry level bar exam.  There is no evidence that experienced attorneys in good standing from non-reciprocity states will violate their professional responsibilities, and file sham petitions for an anti-competitive purpose.  Moreover, it would be delusion and irrational to believe that these experienced attorneys would violate their professional responsibilities and sacrifice their good standing and reputation in the states they are licensed.  Requiring experienced attorneys to again prove they have entry level competence is anti-competitive and decreases competition, driving up the costs of access to the Courts.

## FOURTH CAUSE OF ACTION
## RULES 204(2) AND 204(4) VIOLATE THE 14TH AMENDMENT EQUAL PROTECTION CLAUSE

58. The preceding allegations are incorporated by reference.  Plaintiffs aver Rule 204 violates the 14th Amendment Equal Protection Clause even under a rational basis standard of review.

59. Rule 204 on its face is retaliation. Retaliation in the opportunity to exercise constitutional rights is per se unlawful.

60. The American Bar Association has carefully studied this issue, concluding States failure to have admission on motion for all experienced attorneys injures the public and it is not reasonable.

61. Targeting an unpopular class is not rational. It is beyond cavil that it is constitutionally prohibited to single out and disadvantage an unpopular group. *United States v. Windsor*, __ U.S. __, 133 S.Ct. 2675 (2013).  In *Romer v. Evans*, 517 U.S. 620 (1996), the Court held that an amendment to a state constitution, ostensibly just prohibiting any special protections for gay people, in truth violated the Equal Protection Clause, under even a rational basis analysis. In *Romer*, the Supreme Court struck down Colorado's Constitutional Amendment 2 because, the Court held, "[w]e cannot say that Amendment 2 is directed to any identifiable legitimate purpose or discrete objective. It is a status-based enactment divorced from any factual context from which we could discern a relationship to legitimate state interests; it is a classification of persons undertaken for its own sake, something the Equal Protection Clause does not permit." *Id.* at 635. The Supreme Court deemed this "class legislation ... obnoxious to the prohibitions of the Fourteenth Amendment." *Ibid*.

62. Rule 204, similar to the laws targeting gays and lesbians, is obnoxious status-based rule making enacted to target an unpopular group; not even based on

the qualifications of that group, but on the geographical location of the group's bar admission. This is not a legitimate state interest.

63. Moreover, territorial protection is unlawful as a matter of law. Economic protection is not a legitimate state interest. *See Supreme Court of New Hampshire v. Piper*, *supra*, 470 U.S. at 285 n. 18 (1985)("The Privileges and Immunities Clause was designed primarily to prevent such economic protectionism.")

64. If the purpose of a bar exam is to assure minimum competence in order to protect the public, it is obviously not rational to presume otherwise qualified "officers of the court" admitted in a non-reciprocity jurisdiction are categorically disqualified or unqualified, that they do not have a minimum level of competence, and cannot be trusted.

65. When "Study after study has shown that it is almost impossible to get judges to agree on scores for essay answers,"  *See* Geoff Norman, "So What Does Guessing the Right Answer Out of Four Have to Do With Competence Anyway?" *The Bar Examiner*, *supra*, p. 21 (Nov 2008), it is not rational for Rule 204 to require experienced attorneys from 12 disfavored states to pass a second entry level bar exam, but to excuse lawyers from 38 states from this prior restraint.

66. When "Experienced experts surpass novices, those new to a profession, in seven major ways: (a) generating the best solution; (b) pattern recognition; (c)

qualitative analysis; (d) self-monitoring skills in terms of their ability and knowing

what they do not know; (e) choosing appropriate strategies; (f) seeing and

exploiting opportunities; and (g) cognitive effort, meaning they work faster, with

less effort, and greater control,"  Michelene Chi, *Cambridge Handbook of

Expertise and Expert Performance*, *supra*, p. 27,   it is not rational for Rule 204 to

require experienced attorneys from 12 disfavored states to pass a second entry

level bar exam.

67. When nine out of ten fundamental lawyering skills cannot be tested by a

pen and paper bar exam, it is not rational for Rule 204 to require experienced

attorneys from 12 disfavored states to pass a second entry level bar exam.

68.  When the science of complexity demonstrates that the *diversity

prediction theorem*, (sometimes known as the wisdom of the crowd)  is a

mathematical fact, that all of the States licensing tests combined will always be

more accurate that any state's licensing test, it is not rational to require experienced

attorneys in good standing to pass a second entry-level bar exam.

69. The *diversity trumps ability* theorem holds that differences in how

people represent problems (*perspectives*), in the techniques that they use to find

solutions (*heuristics*), in how they categorize events (interpretations), and in the

models that they use to anticipate (*predictive models*) contribute to our collective

ability to locate better solutions to problems, to make more accurate predictions,

and to respond to changing circumstances. Thus, it is not rational to categorically

exclude experienced attorneys in good standing from 12 states.

70. Rule 204 is further irrational because Pennsylvania does not discriminate

against 12 disfavored states, or require five of seven years of prior experience, to

qualify for Pennsylvania admission as a Registered Legal Service Attorneys,[12]

Registered In-house Counsel,[13] and through *Pro Hac Vice* admission.[14]  There is no

minimum experience requirement.  It cannot be plausibly presumed that attorneys

from non-reciprocity states can be safely trusted to represent the indigent,

corporations, and *pro hac vice*, but not others.

71. If by law, a layman is presumed to know the law, or can presumptively

find it, and is presumptively capable of representing herself — *a fortiori* an

experienced licensed attorney can do the same.  The hypothesis that a layman is

presumptively competent, while on the other hand, an experienced lawyer is

presumptively incompetent is implausible and irrational.

72. Plaintiffs assert their right to injunctive and declaratory relief under 28

U.S.C. §2201.  There is an actual controversy of sufficient immediacy and

concreteness relating to the legal rights of the Plaintiffs and their injury, and their

---

[12] Pennsylvania Supreme Court Rule 311.

[13] Pennsylvania Supreme Court Rule 302.

[14] Pennsylvania Supreme Court Rule 301.

relation to and the duties of the Defendants, to warrant relief under 28 U.S.C. § 2201.

73. Plaintiffs therefore request the following relief:

- An Order declaring the Pennsylvania Supreme Court Rule 204(2) reciprocity requirement and 204(4) five year requirement invalid and unconstitutional, and enjoining its enforcement.

- Costs.

- Attorney fees.

- Grant such other relief as may be just and proper.

Dated:  December 11, 2013        */s/ Joseph Robert Giannini*
Joseph Robert Giannini, Esq.
PA State Bar 38814
Attorney for Plaintiffs NAAMJP et. al.
12016 Wilshire Blvd. Suite 5
Los Angeles, CA 90025
Phone 310 207 1776
Email j.r.giannini@verizon.net