**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **NATIONAL ASSOCIATION FOR THE** | : | |
| **ADVANCEMENT OF** | : | |
| **MULTIJURISDICTIONAL PRACTICE** | : | |
| **(NAAMJP), et al.,** | : | **CIVIL ACTION** |
| **Plaintiffs,** | : | |
| | : | **No. 13-7382** |
| **v.** | : | |
| | : | |
| **HON. CHIEF JUSTICE RONALD D.** | : | |
| **CASTILLE, et al.,** | : | |
| **Defendants.** | : | |

**MEMORANDUM**

**MCHUGH, J.**                                                             **DECEMBER 11, 2014**

### Summary of the Facts

This lawsuit is a constitutional challenge to Pennsylvania's reciprocal bar admissions rule. The rule in question, Rule 204, Pennsylvania Bar Admission Rules, provides that the Pennsylvania bar will allow experienced lawyers admitted in other states to join the Pennsylvania bar without taking the Pennsylvania bar exam, subject to certain additional requirements. The particular additional requirement at issue here limits admission by motion to lawyers practicing law in states that also allow Pennsylvania lawyers to gain admission by motion. In other words, Rule 204 only allows admission by motion for lawyers admitted in states with reciprocal admission-by-motion policies.  Plaintiffs contend that this reciprocity policy infringes the rights of lawyers who wish to practice in Pennsylvania but now practice only in a state that does not have a reciprocal admission policy.

1

Plaintiffs are two individuals and an organization.  Mr. Rosario, an attorney, graduated from an accredited law school in Maryland and is admitted to practice law in Maryland and Washington, D.C. He applied for admission to the Pennsylvania bar, but Pennsylvania rejected his application because Maryland is not a reciprocal state, and he had gained admission to the D.C. bar by motion rather than exam. Mr. Rosario asserts that he would apply for reciprocal admission in Pennsylvania again if the rules changed.

Mr. Riviere is admitted to the New Jersey bar. He asserts that he *would* apply for reciprocal admission in Pennsylvania, but that he would be rejected because New Jersey does not grant admission by motion to Pennsylvania lawyers.

The National Association for the Advancement of Multijurisdictional Practice (NAAMJP) describes itself as "a public benefit corporation organized under California law with offices in Los Angeles." First Amended Complaint ¶ 3. NAAMJP's mission is to challenge the traditional bar admissions system that places high barriers before lawyers who wish to practice in multiple states.

Defendants are the Justices of the Pennsylvania Supreme Court. The Justices promulgated Rule 204, though they contend that they do not enforce it.

## Discussion

### I.      Standard of Review

The case is now before me on cross motions for summary judgment. Rule 56 of the Federal Rules of Civil Procedure directs district courts to "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). By filing their cross motions, both parties

have claimed there is no material factual dispute and that each is entitled to judgment as a matter of law.

After reading the parties' briefs, including their joint statement of undisputed facts, and hearing oral argument from counsel, I am satisfied there is no genuine dispute as to any material fact.  The sole question is which party is entitled to judgment as a matter of law.

Plaintiffs contend that Rule 204 violates many provisions of the Constitution, beginning with Article I, Section 8's Commerce Clause, and continuing all the way through to the Fourteenth Amendment. Defendants offer several responses. First, Defendants contend that Plaintiffs lack standing to challenge Rule 204. Second, Defendants argue that even if Plaintiffs have standing, Defendants are immune from Plaintiffs' challenge. Finally, Defendants argue that even if Plaintiffs have standing, and there is no immunity, Rule 204 does not violate any part of the Federal Constitution.

## II.      Standing

### A.  *Standing Generally*

I will consider Plaintiffs' standing first. The Federal Constitution prohibits courts from taking jurisdiction over disputes that do not involve a justiciable case or controversy. *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560 (1992). One of the requirements of establishing a 'case or controversy' is that the plaintiffs must have standing to pursue their claims. The Supreme Court outlined three necessary elements of standing in *Lujan*:

> First, the plaintiff must have suffered an "injury in fact"—an invasion of a legally protected interest which is (a) concrete and particularized … and (b) "actual or imminent, not 'conjectural' or 'hypothetical,' " ….  Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be "fairly ... trace[able] to the challenged action of the defendant, and not ... th[e] result [of] the independent action of some third party not before the court."

> …. Third, it must be "likely," as opposed to merely "speculative," that the injury
> will be "redressed by a favorable decision."

*Lujan*, 504 U.S. at 560–61 (internal citations omitted).  Furthermore, " 'a plaintiff must

demonstrate standing for each claim he seeks to press' and 'for each form of relief' that is

sought." *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734 (2008) (citing *DaimlerChrysler*

*Corp. v. Cuno,* 547 U.S. 332, 352 (2006)).

Lack of standing is a jurisdictional bar, so even if parties never raise the issue, a court

cannot hear a case if the plaintiffs lack standing to bring it:

> The question of standing is not subject to waiver, however: "[W]e are required to
> address the issue even if the courts below have not passed on it, and even if the
> parties fail to raise the issue before us. The federal courts are under an
> independent obligation to examine their own jurisdiction, and standing 'is perhaps
> the most important of [the jurisdictional] doctrines.' "

*FW/PBS, Inc. v. Dallas,* 493 U.S. 215, 230–231, 110 S.Ct. 596, 607–608, 107 L.Ed.2d

603 (1990).  *United States v. Hays*, 515 U.S. 737, 742 (1995).  A court must

independently evaluate whether it has standing to hear plaintiffs' claims.

Here, Defendants themselves challenge Plaintiffs' standing, at least as to NAAMJP.

Though Defendants do not challenge the standing of Plaintiffs Rosario and Riviere, I have

considered their standing as well because the question is fundamental to my jurisdiction over the

case, and I am being asked to invalidate a rule established by the highest court of a state.

### B. Standing as to Richard Rosario and Paul Riviere

I am satisfied that Rosario and Riviere both have standing to press their claims. Their

alleged injury—denial of admission to the bar because of a policy of unequal treatment of

lawyers from non-reciprocity states—is concrete and particularized. There is also an obvious

causal connection between their injury and the rule they claim is unconstitutional. The remedy

4

they seek—prohibiting unequal treatment of lawyers in non-reciprocity states—would redress

the claimed injury, at least to the extent that it would even the playing field for lawyers seeking

to admission to the Pennsylvania bar.[1] The only remaining concern is whether the injury they

claim is sufficiently 'actual or imminent.' I conclude that it is.

Standing doctrine limits plaintiffs to bringing claims based on actual injuries. However

this requirement does not mean that an injury must be in the past. While an injury may not be

speculative, an individual can sue to avoid a "real, immediate and direct" prospective injury.

*Davis* 554 US at 734; *City of LA v. Lyons*, 461 U.S. 95, 102 (1983) ("Past exposure to illegal

conduct does not in itself show a present case or controversy regarding injunctive relief … if

unaccompanied by any continuing present adverse effects.").

One situation in which courts recognize that a future injury is sufficiently real,

immediate, and direct arises when a plaintiff challenges a rule that would incontestably be

applied to the plaintiff in a harmful way. In *Sammon v. New Jersey Bd of Medical Examiners*, 66

F.3d 639 (3d Cir. 1995), the Third Circuit found that aspiring midwives had standing to

challenge a rule that would prevent them from acquiring a license. The court wrote:

> [T]here is no indication that the aspiring midwives possibly could obtain a license
> or a physician's indorsement without first going through the 1800 hours of
> instruction. Requiring these women to apply for a license or to approach
> physicians asking for indorsements before going through the required training—
> as the district court appears to suggest—accordingly would serve no purpose.
> **Litigants are not required to make such futile gestures to establish ripeness.**

*Sammon*, 66 F.3d at 643 (emphasis added).

The case before me is similar. Rule 204 as it currently operates would deny Rosario and

Riviere admission to the Pennsylvania bar if they applied. Plaintiffs assert, and Defendants do

---

[1] The remedy Plaintiffs seek may not actually make it easier for Plaintiffs to apply for admission to the Pennsylvania Bar. Pennsylvania could choose between allowing admission on motion for all experienced lawyers, or none of them.  In that event, at least Plaintiffs' misery would have more company.

not disagree, that Rosario and Riviere would apply for Pennsylvania bar admission if Rule 204 changes, but their applications would be futile as the Rule stands now. Only one of them has already been denied admission, but both currently have an injury-in-fact for the purposes of standing.

### C.  Standing as to NAAMJP

Whether NAAMJP has standing is a more complicated question. It may not be necessary to address at all because I find the individual Plaintiffs have standing:

> Because Schumacher has standing to maintain this action, and Schumacher and Hodge present identical challenges to Rule 203(a)(2)(ii), we need not consider whether Hodge would have standing to bring this action individually.

*Shumaker v. Nix*, 965 F.2d 1262, 1264 n.1 (3d Cir. 1992). Nonetheless in the interest of being thorough, I have evaluated whether NAAMJP has standing independently of the individual plaintiffs. I conclude it does.

Associations may acquire standing through three legal mechanisms. An association may have standing based on its own injury. Second, it may have 'third party' standing to bring suit on behalf of another party that is for some reason inhibited from bringing suit on its own behalf. *Taliaferro v. Darby Tp. Zoning Bd.*, 458 F.3d 181, 189 n. 4 (3d Cir. 2006); *NAAMJP v. Gonzales*, 211 Fed. App'x 91, 95 (3d Cir. 2006).  Finally it may have 'associational' standing as the representative of members. *Pennsylvania Psychiatric Soc. v. Green Spring Health Servs., Inc.*, 280 F.3d 278, 283 (3d Cir. 2002) ("Absent injury to itself, an association may pursue claims solely as a representative of its members.").

As to NAAMJP's direct standing, Defendants point out that NAAMJP cannot be admitted to practice law and therefore cannot be directly injured by Rule 204. Plaintiffs offer no

6

support for NAAMJP's standing under this theory. Their motion for summary judgment merely asserts that the individual plaintiffs have standing, and therefore "this Court need not address whether NAAMJP, Keystone Doe, and Sojourner Doe have standing."  Plaintiffs' Motion for Summary Judgment 13.  By definition, NAAMJP cannot have suffered an injury itself, and I conclude that it lacks direct standing.

Next, Defendants argue that Plaintiffs lack "third party" standing because NAAMJP has not identified a third party that would have standing but is hindered from bringing suit on its own behalf. To establish third party standing, a party must show:

> (1) The litigant has suffered an injury in fact, giving him a sufficiently concrete interest in the outcome of the issue; (2) the litigant has a close relation to the third party; and (3) there exists some hindrance to the third party's ability to protect his own interest.

*Taliaferro*, 458 F.3d at 189 n.4. NAAMJP also fails this test. As discussed above, NAAMJP has not itself suffered an injury due to Rule 204. *Storino v. Borough of Point Pleasant Beach*, 322 F.3d 293, 295 (3d Cir. 2003) ("Because the Storinos have not suffered an injury in fact, they also do not have third party standing.").

I now turn to whether NAAMJP can assert associational standing and litigate as a representative of its members. For an association to have standing on behalf of its members, the Supreme Court requires (a) that the association's "members would otherwise have standing to sue in their own right, (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333, 343 (1977) (abrogated by statute on other grounds).

The second and third requirements are easily satisfied. NAAMJP exists for the purpose of filing these claims (or more broadly, for the purpose of promoting lawyers' rights to practice in

multiple jurisdictions), so the claims are certainly germane to the organizations purpose. Nor do these claims, which challenge the constitutionality of a rule and ask only for the rule to be enjoined, require individualized proof of the rule's impact on specific persons. *See Hunt*, 423 U.S. at 344 ("neither the interstate commerce claim nor the request for declaratory and injunctive relief requires individualized proof and both are thus properly resolved in a group context."); *Hospital Council v. City of Pittsburgh*, 949 F.2d 83, 89 (3d Cir. 1991) ("The Supreme Court has repeatedly held that requests by an association for declaratory and injunctive relief do not require participation by individual association members.").

I find that the first requirement is also satisfied. To attain standing on behalf of members, an organization cannot merely argue "there is a statistical probability that some of those members are threatened with concrete injury." *Summers v. Earth Island Inst.*, 555 U.S. 488, 497 (2009). An organization must "make specific allegations establishing that at least one identified member had suffered or would suffer harm." *Id.*; *see also FW/PBS, Inc. v. Dallas*, 493 U.S. 215 (1990) (denying associational standing because party's affidavit did not name individuals allegedly harmed).

NAAMJP has submitted affidavits from at least one identified member[2] regarding the harm he faces. One of these is from Mr. Rosario, who is also an individual plaintiff and has standing himself. The situation here is distinguishable from the case on which Defendants rely, *Goode v. City of Philadelphia*, 539 F.3d 311 (3d Cir. 2008). In *Goode*, the Third Circuit denied associational standing to community organizations. The court explained, "the complaint merely states that the members either live in or own property that 'would potentially be affected by the outcome of this action.' " *Goode*, 539 F.3d at 325. This potential injury was too speculative to

---

[2] It has also submitted affidavits from attorneys who purport to fear retaliation if named.  I give no credence to the notion that any of the Justices of the Pennsylvania Supreme Court would engage in such conduct against a lawyer invoking his or her constitutional rights.

show the associations' members suffered injuries-in-fact. *Id.* ("Without specific allegations showing that the Agreement causes the members of the community organizations injury in fact, appellants have failed to demonstrate that its members would have standing to pursue this case in their own right."). Unlike in *Goode*, NAAMJP has identified at least one specific member who satisfies the injury-in-fact requirement. I conclude that NAAMJP has associational standing.[3]

### III.   Immunity

The Justices argue that they are shielded from Plaintiffs' claims by legislative and judicial immunities. Citing to *Supreme Court of Virginia v. Consumers Union of the U.S., Inc.*, 446 U.S. 719, 734 (1980), Defendants contend, "When judges perform certain legislative acts, legislative immunity insulates them, much like traditional legislators, from suits challenging those acts." Defendants' Motion for Summary Judgment 30. According to Defendants, they acted in a legislative capacity when adopting Pennsylvania's bar admission rules, and therefore are absolutely immune from suit over those rules.  The Justices add that to the extent they have any role in enforcing the bar admission rules, they are immunized from suit by the doctrine of judicial immunity. Plaintiffs counter that the Third Circuit has already permitted similar lawsuits challenging judge-enacted rules in *Tolchin v. Supreme Court of the State of New Jersey*, 111 F.3d 1099, 1107 (3d Cir. 1997), and *Schumacher v. Nix*, 965 F.2d 1262 (3d Cir. 1992).

There appear to be conflicting authorities governing the applicability of immunities to Plaintiffs' claims. In their complaint, Plaintiffs bring their claims against Defendants only in their "official capacities." Plaintiffs' First Amended Complaint ¶ 6 ("These Honorable Justices are sued in their official capacity for prospective injunctive and declaratory relief."). Suits

---

[3] Somewhat paradoxically, unlike Third Party standing, it does not appear there is any requirement that members are unable to assert the right on their own.

against state officials in their "official capacity" are often described as suits in which the real

party in interest is the State itself. *Kentucky v. Graham*, 473 U.S. 159, 166 (1985) ("As long as

the governmental entity receives notice and an opportunity to respond, an official-capacity suit

is, in all respects other than name, to be treated as a suit against the entity."); *Conklin v. Anjou*,

495 Fed. App'x 257 (3d Cir. 2012). Because "official capacity" suits were suits against the state

rather than suits against the individuals actually named as defendants, the Supreme Court in

*Kentucky v. Graham* distinguished immunities that are available in official capacity suits from

those available in personal capacity suits:

> When it comes to defenses to liability, an official in a personal-capacity action
> may, depending on his position, be able to assert personal immunity defenses[.] In
> an official capacity action, these defenses are unavailable. The only immunities
> that can be claimed in an official-capacity action are forms of sovereign immunity
> that the entity *qua* entity, may possess, such as the Eleventh Amendment.

*Graham*, 473 U.S. at 167 (1985); *NAAMJP v. Berch*, 973 F. Supp. 2d 1082, 1097 (D. Ariz. 2013)

(finding judicial immunity not available to defendants because they had been sued only in their

official capacity), *aff'd* 2014 WL 6871577 (9th Cir. 2014); *PG Pub. Co. v. Aichele*, 902 F.Supp.

2d 724, 744 (W.D. Pa. 2012) (finding that because only official capacity claims were brought

against two defendants, "the Secretary and the Division Manager can invoke only the 'forms of

sovereign immunity' available to those entities"). Unless legislative or judicial immunities are

somehow forms of sovereign immunity, *Kentucky v. Graham* seems to direct me to conclude that

these immunities are not available to officials sued only in their official capacity.

However—and this is a significant qualification—other binding precedents have applied

at least the doctrine of legislative immunity to protect defendants who were acting in a legislative

capacity, even when the suit was brought against the defendant in an official capacity.  In

*Consumers Union*, plaintiffs brought suit against the Justices of the Supreme Court of Virginia

10

and others "in *both* their individual and official capacities." *Consumers Union*, 446 U.S. at 724.

The court ruled "the Virginia Court and its members are immune from suit when acting in their

legislative capacity." More recently, the Third Circuit decided *Larsen v. Senate of Com. of Pa.*,

152 F.3d 240 (3d Cir. 1998). The plaintiff had sued members of the Pennsylvania State Senate

and others "in their official and personal capacities." The district court had dismissed the claims

against legislators in their personal capacities, but ruled "the Eleventh Amendment did not bar

[plaintiff's] claims for injunctive and declaratory relief against the individual Senators in their

official capacities." *Id.* at 245. The Third Circuit reversed.  The court explained that legislative

immunity shields state officials acting in a legislative capacity "from claims for injunctive and/or

declaratory relief." The Third Circuit did not discuss *Kentucky v. Graham* and noted in a

footnote, "As the prospective relief sought is of necessity against the Senators in their official

capacities, we do not discourse on the differences between immunity in the individual as

distinguished from official capacities." *Id.* at 254.

      Thus, while *Kentucky v. Graham* instructs me that legislative immunity is not applicable

when defendants are sued only in their official capacities, (sovereign immunity being the only

defense), *Consumers Union* and *Larsen* plainly applied legislative immunity in suits brought

against parties in their official capacities.  Ironically, the Supreme Court in *Kentucky v. Graham*

offered its explanation of the difference between official and personal capacity suits "[b]ecause

this distinction apparently continues to confuse lawyers and confound courts." 473 U.S. at 165.

Unfortunately, unless I am misreading *Consumers Union*, I **continue** to find the potentially

governing authority to be conflicting.

      Assuming that *Consumers Union* and *Larsen* require me to find that legislative immunity

is an available defense, I am not convinced that Defendants here were in fact acting in a

legislative capacity when adopting Rule 204. To determine whether defendants act in a "legislative capacity," courts in the Third Circuit first "ask whether the act is 'substantively legislative' " and second, "whether it is 'procedurally legislative.' " *Larsen*, 152 F.3d at 252.

The Pennsylvania Supreme Court, by carrying out authority granted by the state constitution, may not have been acting in a substantively legislative capacity.  In *Consumers Union*, the Supreme Court held that the judges of the Supreme Court of Virginia were acting in a judicial capacity when adopting local bar rules, but there is a critical distinction between *Consumers Union* and the case before me. In *Consumers Union*, the Supreme Court of Virginia took the position that it had both inherent and statutory authority to create bar admission rules. 446 U.S. at 721.  The United States Supreme Court did not address whether the source of the Virginia Court's authority—statutory or inherent—impacted the availability of legislative immunity.  Other cases, however, have focused upon the relationship between the source of officials' authority to act and the availability of immunity as a defense.  In *Larsen*, the Third Circuit ruled that impeachment, though it is a process with features that appear trial-like, is nonetheless a legislative action because "impeachments are matters 'which the Constitution places within the jurisdiction of either House' " and "represent 'a field where legislators traditionally have power to act.' " 152 F.3d at 251. In Pennsylvania, the state constitution explicitly assigns the task of developing rules for bar admission to the state Supreme Court. Pa. Const. Art. V § 10. Thus in Pennsylvania, bar admission rules—borrowing a phrase from *Larsen*—"are matters which the Constitution places within the jurisdiction of" the Supreme Court and are a field where Pennsylvania's Supreme Court has had the power to act since Article Five, Section 10 was adopted. 152 F.3d at 251. Because the State Supreme Court's authority to promulgate bar rules derives from an explicit grant of constitutional authority rather than a

delegation by the legislature or a nebulous 'inherent power' (as in *Consumers Union*), it may be that the Pennsylvania Supreme Court, even when enacting admissions rules, is acting in a fundamentally judicial capacity.

I do not believe there is enough information in the record before me to find that the promulgation of Rule 204 is procedurally legislative. There is no dispute that the Justices of the Pennsylvania Supreme Court promulgated Rule 204 by some means, but I am unable to determine from what I may properly consider whether the rule was "passed by means of established legislative procedures." *Larsen*, 183 F.3d at 252.

Given the uncertainty of the law on these issues, and given my conclusions below that Defendants are entitled to judgment on the Plaintiffs' substantive claims, I will not decide the question of the Justices' purported immunity.

## IV.    Privileges and Immunities Clause, Art. IV § 2

Article IV, Section 2 of the Constitution provides, "the citizens of each state shall be entitled to all privileges and immunities of citizens in the several states." The Privileges and Immunities Clause protects an aspect of the right of individuals to travel freely among states within the United States. It protects the right of a citizen of one state "to be treated as a welcome visitor rather than an unfriendly alien when temporarily present in the second State." *Saenz v. Roe*, 526 U.S. 489, 500 (1999).[4] The clause does not entirely prohibit states from treating citizens of other states differently than they treat their own citizens. Rather, the clause bars "discrimination against citizens of other States where there is no substantial reason for the

---

[4] The Supreme Court in *Saenz* described three aspects of the constitutional right to travel. 526 U.S. at 500. The second aspect, the right of noncitizens to travel freely to other states temporarily, is guaranteed by the Privileges and Immunities Clause of Article IV, § 2. The third, the right to freely become a citizen of a new state, is guaranteed by the Privileges and Immunities Clause of the Fourteenth Amendment.

discrimination beyond the mere fact that they are citizens of other states." *Saenz*, 526 U.S. at 502.

The clause does not prohibit states from ever treating nonresidents differently from residents. *Piper v. Supreme Court of New Hampshire*, 470 U.S. 274, 279 (1989) ("it is '[o]nly with respect to those 'privileges' and 'immunities' bearing upon the vitality of the Nation as a single entity' that a State must accord residents and nonresidents equal treatment.") (citing *Baldwin v. Montana Fish & Game Comm'n*, 436 U.S. 371, 383 (1978)). For example, the Supreme Court permitted Montana to charge residents and nonresidents of the state different fees for elk-hunting licenses because hunting big game was not a sufficiently important activity. *Baldwin*, 436 U.S. at 388 ("Equality in access to Montana elk is not basic to the maintenance or well-being of the Union. Appellants do not—and cannot—contend that they are deprived of a means of a livelihood by the system or of access to any part of the State to which they may seek to travel.").

Unlike elk-hunting, practicing law is a privilege the clause protects. *Piper*, 470 U.S. at 280. The Court held that not only is legal practice "important to the national economy," but also, "the legal profession has a noncommercial role and duty that reinforce the view that the practice of law falls within the ambit of the Privileges and Immunities Clause." *Id.* Restrictions on the practice of law that discriminate on the basis of state residency can be subject to scrutiny under the Privileges and Immunities Clause.

Statutes that burden protected "privileges and immunities" and place different burdens on residents and nonresidents are "invalid unless '(i) there is a substantial reason for the difference in treatment, and (ii) the discrimination practiced against nonresidents bears a substantial

relationship to the State's objective.' " *Tolchin v. Supreme Court of New Jersey*, 111 F.3d 1099,
1111 (3d Cir. 1997) (citing *Piper*, 470 U.S. at 284).

In *Tolchin*, 111 F.3d at 1113, a case challenging New Jersey's requirement that every
admitted lawyer maintain a "bona fide" office and take continuing legal education, the Third
Circuit adopted a two-part inquiry for courts evaluating privileges and immunities claims. First,
the court must consider whether the challenged rule actually discriminates against nonresidents.
*Id.*  Second, the court must decide whether the discrimination imposes too heavy a burden on
nonresidents and whether the rule bears a substantial relationship to a legitimate state objective.
*Id.*  Applying *Tolchin* to the facts in this case leads me to the conclusion that Rule 204 does not
violate the Privileges and Immunities Clause of Article IV, § 2.

As to the first part of the inquiry, like the rule at issue in *Tolchin*, Rule 204 does not
discriminate on the basis of a lawyer's state of residence.  A lawyer living in Pennsylvania who
had only passed the New Jersey Bar would not be eligible for reciprocity.  Plaintiffs contend that
while Rule 204 does not, on its face, impose different requirements for nonresidents, there is a
correlation between residency and current bar admission. Plaintiffs argue the Supreme Court's
decision in *Hillside Dairy Inc. v. Lyons*, 539 U.S. 59 (2003) requires courts to look into a
statute's *effects* on nonresidents even if a statute does not discriminate facially. In *Hillside Dairy*,
the Supreme Court considered the constitutionality of a statute that set different prices for out-of-
state milk producers. Plaintiffs argue that after *Hillside*, "classifications that serve as a proxy for
discrimination or operate in practical effect against out-of-state citizens implicate the Privileges
and Immunities Clause." Plaintiffs' Motion for Summary Judgment 4. Plaintiffs may be correct
that the Clause is "implicated," but the Supreme Court in *Hillside* carefully disclaimed a broad
holding prohibiting statutes with disproportionate effects on nonresidents:

> Whether *Chalker* [the 1919 decision on which the Court relied] should be interpreted as merely applying the Clause to classifications that are but proxies for differential treatment against out-of-state residents, or as prohibiting any classification with the practical effect of discriminating against such residents, is a matter we need not decide at this stage of these cases.

*Hillside Dairy*, 539 U.S. at 67.

If I proceed to consider whether Rule 204—although free of facial discrimination—is a "proxy for differential treatment" or has the "practical effect of discrimination" against nonresidents, the Third Circuit's decision in *Tolchin* compels the conclusion that Rule 204 does not so discriminate. In *Tolchin*, the Third Circuit considered whether New Jersey's bar admissions rules requiring lawyers to maintain a physical office in the state and to physically attend training sessions in the state discriminated against nonresident lawyers. The Third Circuit concluded they did not. The court wrote, "both requirements similarly affect residents and nonresidents" and held the rules did not violate the Privileges and Immunities Clause. *Tolchin*, 111 F.3d at 1113. I am not convinced that *Hillside* overruled or limited *Tolchin*; if there was no discrimination against nonresidents in *Tolchin*, there is none here.

As to the second part of the inquiry, even if Rule 204 does have a disproportionate impact on nonresidents, the impact is outweighed by Pennsylvania's substantial interest in enforcing the rule. Plaintiffs argue that the facts here are analogous to those in *Supreme Court of Virginia v. Friedman*, 487 U.S. 59 (1988). *Friedman* involved a challenge to a Virginia bar admission rule that permitted experienced lawyers to gain admission by motion if they became permanent residents of the state. The Court rejected Virginia's arguments that the rule was useful to ensure lawyers were sufficiently committed to Virginia law and practiced full time, *Friedman*, 487 U.S. at 69–70, because alternative rules not based on residency adequately served those interests. *Id.* In this case, Pennsylvania offers a different justification for Rule 204:

> Pennsylvania's interest in the reciprocity provision is to ease the burden of bar admission for Pennsylvania attorneys seeking to practice law in other states by easing the burden for attorneys licensed in reciprocity states to be admitted to practice law in Pennsylvania.

Joint Statement of Undisputed Facts ¶ 16. The Third Circuit has already held that this interest is a legitimate one. In *Schumacher v. Nix*, 965 F.2d 1262, 1270 (3d Cir. 1992), the Third Circuit heard an Equal Protection challenge to Pennsylvania's Bar Admissions Rule 203. That rule permitted "graduates of unaccredited law schools who are members in good standing of the bar of a 'reciprocal state' and have practiced law there for five years" to gain bar admission without taking the Pennsylvania bar exam. *Id.* at 1264.  The court found that rational basis scrutiny applied, with the result that the Rule would pass Constitutional muster if it was "rationally related to Pennsylvania's interest in securing mutual treatment for its attorneys seeking admission to the bars of other states." *Id.* at 1269. The court agreed that Pennsylvania's interest was legitimate, citing the district court's reasoning:

> It is undisputed that the Rule rests upon a legitimate state interest. As the district court observed, the Rule is intended to 'secure[] for Pennsylvania attorneys who decide to relocate, the advantages of favorable terms of admission to another state's bar by offering that same advantage to attorneys of such other states that will reciprocate.' And it is established that such reciprocity provisions are a valid exercise of state power, because they help ease the burdens of relocation for resident attorneys seeking admission to the bars of other states.

*Schumacher*, 965 F.2d at 1270 (citing *Hawkins v. Moss*, 503 F.2d 1171, 1176–77 (4th Cir. 1974)).

There can be no doubt that Pennsylvania's rule granting reciprocity to attorneys licensed elsewhere bears a substantial relationship to its interest in assisting locally licensed attorneys in gaining admission in other states.  Accordingly, Defendants' Motion for Summary Judgment as to Plaintiffs' claim under Art. IV, Section 2 is granted.

### V.        Privileges and Immunities Clause, Fourteenth Amendment

Plaintiffs allege that Rule 204 violates the Privileges and Immunities Clause of the Fourteenth Amendment.  In the words of the Court of Appeals, this clause "remained essentially moribund" between 1872, when the Supreme Court decided *The Slaughter-House Cases*, 83 U.S. 26 (1872), and 1999, when the high court re-invigorated it with *Saenz v. Roe*, 526 U.S. 489 (1999).  *See In re Sacred Heart Hosp. of Norristown*, 133 F.3d 237, 244 (3d Cir. 1998).  In *Saenz*, the Court ruled that the Privileges and Immunities Clause of the Fourteenth Amendment is the guardian of one aspect of a right that courts had already recognized for some time: the right to interstate travel. Specifically, the Privileges and Immunities Clause of the Fourteenth Amendment was held to guarantee the rights of citizens of one state who establish residency in another state to access "the same privileges and immunities enjoyed by other citizens of the same State." *Saenz*, 526 U.S. at 501–02.  Stated differently, the Privileges and Immunities clause guarantees that states cannot treat residents differently based on how long they have lived in the state.[5]

The Third Circuit has drawn on Fourteenth Amendment Equal Protection analysis as a framework for analyzing Fourteenth Amendment Right to Travel cases. *Connelly v. Steel Valley School Dist.,* 706 F.3d 209 (2013) ("We review both of Connelly's [equal protection and right to travel interstate] claims under the same standard because 'the right to interstate travel finds its most forceful expression in the context of equal protection analysis.' ") (quoting *Schumacher v. Nix*, 965 F.2d at 1266). If a law "creates 'distinctions between newcomers and longer term residents' " it is subject to strict scrutiny. *Connelly*, 706 F.3d at 214. In contrast, "[w]hen the receipt of a government benefit is conditioned on factors other than duration of residency, we

---

[5] Because neither individual Plaintiff has declared any intention of becoming a resident of Pennsylvania, it is possible that Plaintiffs do not have standing to bring this particular claim.

apply rational basis review to determine whether the right to travel has been unconstitutionally burdened." *Id.*

Rational basis scrutiny plainly applies here. Rule 204 does not condition bar admission on the duration of any person's residency in Pennsylvania, and Plaintiffs' arguments to the contrary are not convincing.

First, Plaintiffs argue that although Rule 204 does not facially make any distinctions based on duration of residency, it "serves as a proxy in practical effect for discrimination." Plaintiffs Reply in Support of their Motion for Summary Judgment 17. The rule "categorically excludes otherwise qualified attorneys from ten disfavored states." *Id.* By erecting barriers to Pennsylvania bar admission for lawyers admitted in certain states, in Plaintiff's view Rule 204 makes it more difficult for lawyers admitted in certain states to establish residency in Pennsylvania.

Though the Third Circuit has previously held that a similar reciprocity rule is not a classification based on duration of residency, Plaintiffs argue that the Supreme Court's subsequent decision in *Saenz* now requires this court to apply strict scrutiny. I disagree that there is tension between *Schumacher* and *Saenz*. In *Schumacher*, the Third Circuit considered a rule that only allowed graduates of unaccredited law schools to be admitted to the Pennsylvania bar if they were already admitted in a reciprocal state. *Schumacher*, 965 F.2d at 1264 n.2. The court held that even though the rule had the effect of discouraging the plaintiff from moving to Pennsylvania, it made classifications based only on the accreditation status of the plaintiff's law school. *Id.* at 1268. Therefore it "neither establishes a classification based on residency nor erects a barrier to migration." *Id.* In contrast, the Supreme Court in *Saenz* applied strict scrutiny to a rule that limited the welfare benefits that state residents could receive based on how long they

had resided in California. *Saenz*, 526 U.S. at 493 (1999).  The rule at issue in *Saenz* made a classification based on residency; the rule at issue in *Schumacher* did not.

The Third Circuit's decision in *Connelly* makes it clear that a rule does not have the effect of classifying based on residency if it merely has an indirect effect on interstate travel, even after *Saenz*.  In that case, a school district offered teachers higher salaries based on in-state teaching experience. The plaintiff, who had taught for many years outside of Pennsylvania, did not receive credit for his out-of-state experience. *Id.* at 211. The plaintiff alleged the rule amounted to a restraint on interstate travel, a fundamental right, and therefore should be subject to strict scrutiny. *Id.* The Third Circuit disagreed, explaining, "Steel Valley's classification is based on the location of teaching experience, not duration of residency. Thus, [the plaintiff] is being treated no differently than lifelong residents of Pennsylvania." *Id.* at 215. The court acknowledged "that Steel Valley's classification creates some incidental burden on interstate travel." *Id*. Nonetheless, because the rule focused on teaching experience and not directly on residency, it did not trigger strict scrutiny.

Like the rules in *Schumacher* and *Connelly*, Rule 204 does not make a classification based on the duration of residence. Even though Rule 204 may indirectly discourage some individuals from moving to Pennsylvania, the rule itself does not make a classification based on the duration of residence.

 Second, Plaintiffs distinguish *Connelly* and argue that strict scrutiny should apply because, unlike teaching, the practice of law is a fundamental right. Plaintiffs point out that in Equal Protection analysis, strict scrutiny applies if a law either makes a suspect classification or burdens a fundamental right. *Connelly*, 706 F.3d at 213. They cite to the following passage in

20

*Supreme Court of New Hampshire v. Piper* as proof that the practice of law is a 'fundamental

right' for Fourteenth Amendment privileges and immunities analysis:

> The lawyer's role in the national economy is not the only reason that the
> opportunity to practice law should be considered a "fundamental right." We
> believe that the legal profession has a noncommercial role and duty that reinforce
> the view that the practice of law falls within the ambit of the Privileges and
> Immunities Clause.

*Piper*, 470 U.S. at 281.

 This is a creative argument, but it suffers from a fatal flaw. *Piper* addressed

whether the practice of was protected by the Privileges and Immunities Clause of Article

IV, Section 2, **not** the Privileges and Immunities Clause of the Fourteenth Amendment.

The Clause in Article IV, as the court in *Piper* explained, "was intended to create a

national economic union." *Piper*, 470 U.S. at 280. To achieve its purpose of promoting

economic union, the clause covers many activities that are not "fundamental rights" for

the purposes of Fourteenth Amendment Equal Protection. *Schumacher*, 965 F.2d at 1268

n.9 ("We note, however, that 'the right to practice law is not a fundamental right for the

purposes of … equal protection analysis.") (citing *Edelstein v. Wilentz*, 812 F.2d 128, 132

(3d Cir. 1987)).

 Because Rule 204 neither makes a suspect classification nor burdens a fundamental right

for Fourteenth Amendment purposes, I must "uphold it so long as it bears a rational relation to

some legitimate end." *Connelly*, 706 F.3d at 213 (citing *Maldonado v. Houstoun*, 157 F.3d 179,

184 (3d Cir. 1998)).

 Plaintiffs believe Rule 204 fails to meet this low bar. They argue that Rule 204 should

still be struck down because it is not rationally related to attorneys' "fitness or capacity to

practice law." Plaintiffs Motion for Summary Judgment 12 (quoting *Schumacher*, 965 F.2d at

1269). Plaintiffs point to *Schware v. Board of Law Examiners*, 353 U.S. 232, 239 (1957), where

the Supreme Court wrote, "A State can require high standards of qualification, such as good

moral character or proficiency in its law, before it admits an applicant to the bar, but any

qualification must have a rational connection with the applicant's fitness or capacity to practice

law." *Schware*, 353 U.S. at 239. According to Plaintiffs, the only legitimate interest that can

justify Pennsylvania's bar admissions rules is its interest in only admitting competent lawyers.

I am convinced that under the prevailing case-law, Pennsylvania has latitude to define its

legitimate interests more broadly.  The passage that Plaintiffs cite comes from a case evaluating

whether a state could exclude from bar admission an otherwise qualified candidate because of his

prior affiliation with the Communist party.  The language quoted is sweeping, but all *Schware*

specifically held was that the state bar's character and fitness evaluation could not discriminate

against a candidate based on his past political affiliation. 353 U.S. at 246–47. I do not read

*Schware* as announcing a rule that only fitness to practice may be considered in fashioning bar

admission rules.  I find significant support for reading *Schware* more narrowly in the fact that the

Third Circuit accepted the legitimacy of Pennsylvania's interest in reciprocity agreements.

*Schumacher*, 965 F.2d at 1272 ("Pennsylvania has a legitimate interest in securing mutual

treatment for *all* of its attorneys seeking admission to the bars of other states."). Though

plaintiffs could be correct that Rule 204 does not serve the interests of Pennsylvania's citizens in

unimpeded access to competent legal counsel, it is rationally related to the Commonwealth's

separate interest in supporting lawyers already admitted to its bar.

Defendants' Motion for Summary Judgment as to Plaintiffs' claim under the Privileges

and Immunities Clause of the Fourteenth Amendment is therefore granted.

## VI.    Dormant Commerce Clause

Plaintiffs argue that Rule 204 "regulates interstate commerce unevenly" (Plaintiffs'
Motion for Summary Judgment 21) and therefore it violates the Constitution's Dormant
Commerce Clause.

The Dormant Commerce Clause does not explicitly appear in the text of the Constitution,
but has emerged through judicial and scholarly interpretations of Article I, Section 8. The
Commerce Clause grants Congress the authority to regulate interstate commerce. Courts have
ruled that Congress' authority over interstate commerce prevents states from passing laws that
unduly interfere with interstate commerce. *Huron Portland Cement Co. v. City of Detroit
Michigan*, 362 U.S. 440, 441–42 (1960) ("a state may not impose a burden which materially
affects interstate commerce in an area where uniformity of regulation is necessary."). In this
way, the Dormant Commerce Clause doctrine is similar to preemption. However it differs from
preemption in at least this important respect: the Dormant Commerce Clause is an "implicit
restraint on state authority, even in the absence of a conflicting federal statute." *United Haulers
Ass'n v. Oneida-Herkimer Solid Waste Mgmt. Auth.*, 550 U.S. 330, 338 (2007). The Dormant
Commerce Clause goes beyond protecting the supremacy of federal law. The Third Circuit
described it as affirmatively promoting a paradigm of interstate commerce that is unhindered by
state restraints. "Axiomatic in dormant Commerce Clause jurisprudence is the principle that a
state cannot impede free market forces to shield in-state businesses from out-of-state
competition." *Cloverland-Green Spring Dairies, Inc. v. Pennsylvania Milk Marketing Board*,
298 F.3d 201, 210 (3d Cir. 2002) (*Cloverland I*).

The doctrine is not so broad that it bars all state regulation that affects interstate
commerce. Instead, it requires courts to consider a law's effects on interstate commerce along

with the interests that a state is promoting by passing a law: "the Constitution when 'conferring upon Congress the regulation of commerce, never intended to cut the States off from legislating on all subjects relating to the health, life, and safety of their citizens, though the legislation might indirectly affect the commerce of the country.' " *Huron*, 362 U.S. at 443–44 (citing *Sherlock v. Alling*, 93 U.S. 99, 103 (1876)).

In broad terms, courts have relied on two levels of scrutiny to analyze Dormant Commerce challenges.[6] The first level applies if a restriction on commerce is discriminatory on its face, and is a "virtually *per se* rule of invalidity." *Oregon Waste Sys., Inc. v. Dept. of Env. Quality of State of Or.*, 511 U.S. 93, 100 (1994). For statutes "that have only incidental effects on interstate commerce," courts apply a more forgiving balancing test, upholding the challenged statute unless "the burden imposed on such commerce is clearly excessive in relation to the putative local interests. *Id.* (citing *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970)).

A. *Per Se Invalidity for Facially Discriminatory Statutes and Heightened Scrutiny*

To determine if a statute is inherently discriminatory and subject to heightened scrutiny, courts have looked at a variety of factors related to the statute's text, purpose, and effects. If a statute "discriminates on its face against interstate commerce," or if a statute is plainly "motivated by 'simple economic protectionism,' " the statute is presumptively invalid. *United Haulers Ass'n*, 550 U.S. at 338 (2007). The presumed invalidity "can only be overcome by a showing that the State has no other means to advance a legitimate local purpose." *Id.*

When a statute is not obviously discriminatory, heightened scrutiny nonetheless applies if the law "discriminates against interstate commerce' either in its purpose or effect." *Cloverland I*,

---

[6] This may be an oversimplification, as the courts have employed strict scrutiny in some instances even where a statute is not discriminatory on its face.

298 F.3d at 210; *Cloverland-Green Spring Dairies, Inc. v. Pennsylvania Milk Mktg. Bd.*, 462

F.3d 249, 261 (3d Cir. 2006) (*Cloverland II*); *see also Tolchin*, 111 F.3d at 1107 ("Heightened

scrutiny applies not only when legislation is facially discriminatory, but also when a state statute

or regulation's 'effect is to favor in-state economic interests over out-of-state interests.' ").

A court that finds heightened scrutiny applies requires the plaintiff to prove the statute

"discriminates against interstate commerce." *Cloverland II*, 462 F.3d at 261; *Hughes v.*

*Oklahoma*, 441 U.S. 322, 336 (1979). The Third Circuit described two ways a plaintiff may

show discrimination.  First, a plaintiff "may show that the challenged state statute has

extraterritorial effects that adversely affect economic production (and hence interstate

commerce) in other states, thereby forcing 'producers or consumers in other states [to] surrender

whatever competitive advantages they may possess' to 'give local consumers an advantage over

consumers in other states." *Cloverland II*, 462 F.3d at 261. Second, a plaintiff "may show that

the 'object [of the law] is local economic protectionism,' in that it disadvantages out-of-state

businesses to benefit in-state ones." *Id.* at 262. If the plaintiffs carry their burden of proof, "the

burden then shifts to the state to prove that 'the statute serves a legitimate local purpose, and that

this purpose could not be served as well by available nondiscriminatory means.' " *Id.*

Heightened scrutiny does not apply to Rule 204. It does not discriminate against out-of-

state commerce on its face, a fact which Plaintiffs do not contest. Nor is there other evidence that

the purpose or effect of the Rule is to favor in-state economic interests over out-of-state interests.

It applies equally to Pennsylvania residents and nonresidents alike.

Plaintiffs argue that Rule 204 has the effect of discriminating against out-of-state interests

because it "categorically qualifies lawyers licensed in thirty-eight states to do business in

Pennsylvania without taking a burdensome repetitive bar exam, and it categorically disqualifies

Plaintiffs and otherwise qualified and experienced attorneys from eleven states from the identical privilege and immunity." Plaintiffs' Motion for Summary Judgment 21–22. In support of their argument for heightened scrutiny, Plaintiffs analogize Rule 204 to the reciprocal licensing statute that the Supreme Court struck down in *Great Atlantic & Pacific Tea Co. v. Cottrell*, 424 U.S. 366 (1976). *Great Atlantic* involved a challenge to Mississippi's rule that allowed out-of-state milk producers to sell their products in Mississippi only if the producer operated in a state that permitted Mississippi producers to sell in that state. The Court found that Mississippi's reciprocity requirement had the practical effect of excluding all milk produced in non-reciprocal states from distribution in Mississippi. *Id.* at 375. The court explained that given the existence of discrimination, "[o]nly state interests of substantial importance can save s 11 in the face of that devastating effect upon the free flow of interstate milk." *Id.* Mississippi was ultimately unable to convince the Court that such interests existed.

This case differs in a critical respect from *Great Atlantic*. While Mississippi's rule entirely excluded out-of-state producers from selling in-state, Rule 204 does not exclude out of state lawyers from practicing in Pennsylvania. Lawyers who practice in states without reciprocity agreements may gain admission by taking the bar exam. Aspiring lawyers living in Pennsylvania must take the same exam. Out-of-state lawyers may also apply for *pro hac vice* status. I agree with Plaintiffs that admission by motion is preferable to taking the bar exam, but Rule 204's reciprocity requirement does not completely exclude anyone from practicing law in Pennsylvania. There is no doubt that Pennsylvania may constitutionally require bar applicants to take an exam. *Leis v. Flynt*, 439 U.S. 438, 444 (1979) (recognizing "the traditional authority of state courts to control who may be admitted to practice before them"); *NAAMJP v. Berch*, 973 F.Supp.2d at 1112. Given that Pennsylvania could require **every** applicant to sit for the bar

exam, the practical effect of Rule 204 is that it actually makes it easier for some lawyers to join the bars of states that voluntarily agree to reciprocity arrangements. 424 U.S. at 278.  The Supreme Court recognized as much in *Great Atlantic*, noting that it "has recognized that mutually beneficial objectives may be promoted by voluntary reciprocity agreements, and that the existence of such an agreement between two or more States is not a per se violation of the Commerce Clause of which citizens of nonreciprocating States who do not receive the benefits conferred by the agreement may complain."  424 U.S. at 378 (citing *Kane v. New Jersey*, 242 U.S. 160, 167–68 (1916) and *Bode v. Barrett*, 344 U.S. 583 (1953)).

Therefore I find that heightened scrutiny does not apply to Rule 204, and any impact it has on interstate commerce is merely incidental.

### B.  *Reduced Scrutiny and* Pike

I accept, at least for the sake of argument, that Rule 204 has incidental effects on interstate commerce. The individual Plaintiffs in this case now practice in nonreciprocal states and say they would practice in Pennsylvania if the Rule permitted them admission by motion. They could practice in Pennsylvania if they passed the bar exam, or were admitted *pro hac vice*, but I agree that passing the bar and admission by motion are not the same.  Thus, there is arguably some interstate commerce—practice of law in Pennsylvania by plaintiffs—that is not happening because of Rule 204 and Plaintiffs' unwillingness to take the bar exam.

But merely incidental effects on interstate commerce are not *per se* invalid. The statute will only violate the dormant Commerce Clause if, although it "regulates even-handedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only

incidental, the burden imposed on such commerce is clearly excessive in relation to the putative local benefits." *Pike*, 397 U.S. at 142.[7]

Plaintiffs propose that Rule 204 fails under the *Pike* test because Pennsylvania's interest in reciprocity is illegitimate. However, the Third Circuit has already held that Pennsylvania has a legitimate interest in enforcing bar admissions reciprocity agreements. *See discussion supra at Section IV*; *Schumacher*, 965 F.2d at 1270. *Schumacher* was analyzing an equal protection challenge, but what is pertinent for purposes of constitutional analysis is that it found that "Pennsylvania's interest in securing mutual treatment for its attorneys seeking admission to the bars of other states" is a legitimate state interest.

Nor does Rule 204, in promoting that legitimate interest, impose burdens on interstate commerce that are clearly excessive. As discussed above, Rule 204 does not prevent anyone from practicing law in Pennsylvania. Thus, the burden that Rule 204 imposes is the difference between the difficulty of gaining admission by motion and the difficulty of gaining admission by bar exam for experienced lawyers who have already taken and passed at least one such exam in another state. One could as easily say that Rule 204 has **eased** the burden for lawyers practicing in the 37 states with which Pennsylvania has a reciprocity agreement. Any burden, especially when weighed against the broader benefit, is not clearly excessive.

Defendants' Motion for Summary Judgment as to Plaintiffs' claim under the Dormant Commerce Clause is granted.

---

[7] It bears mention that the Dormant Commerce Clause analysis, and the *Pike* test in particular, has been criticized as vague and prone to bias-based decisionmaking. Justice Scalia, in *Bendix Autolite Corp. v. Midwsco Enters., Inc.*, 486 U.S. 888, 897 (1988), commented that the balancing test from *Pike* requires judges to ask, "whether a particular line is longer than a particular rock is heavy." A quantitative study of state and federal dormant commerce clause cases found a statistically significant correlation between federal appellate judges' political ideologies and their commerce clause decisions. Mehmet Konar-Steenberg & Anne Peterson, *Forum Federalism and Free Markets* 80 UMKC L. Rev. 139, 156 (2011) .

## VII.    First Amendment

Plaintiffs make a variety of challenges to Rule 204 under the First Amendment. The Justices argue that all of Plaintiffs' challenges are facial challenges and therefore can only be successful if Plaintiffs show that "no set of circumstances exists under which [the challenged rule] would be valid." *Rust v. Sullivan*, 500 U.S. 173, 183 (1991) ("Petitioners face a heavy burden in seeking to have the regulations invalidated as facially unconstitutional"). Defendants are correct that Plaintiffs face this heavy burden, except as to Plaintiffs' claim of substantial overbreadth. A statute that is overbroad may have legitimate applications, but nonetheless violate the First Amendment. *City of Chicago v. Morales*, 527 U.S. 41, 52 (1999) (Overbreadth doctrine "permits the facial invalidation of laws that inhibit the exercise of First Amendment rights if the impermissible applications of the law are substantial when judged in relation to the statute's plainly legitimate sweep."); *Broadrick v. Oklahoma*, 413 U.S. 601, 630 ("Although the Court declines to hold the Oklahoma Act unconstitutional on its face, it does expressly recognize that overbreadth review is a necessary means of preventing a 'chilling effect' on protected expression."); *DeJohn v. Temple University*, 537 F.3d 301, 313–14 (3d Cir. 2008) (overbreadth doctrine permits scrutiny of school rules that may have the effect of chilling speech).

### a.   Substantial Overbreadth

Plaintiff argues that Rule 204 is overbroad in violation of the First Amendment because it needlessly suppresses the speech of lawyers admitted in non-reciprocity states. Plaintiff's Motion for Summary Judgment 33. According to Plaintiff, the practice of law is a constitutionally protected activity, and Rule 204 prevents attorneys from non-reciprocity states from practicing in Pennsylvania without an adequate justification.

A statute can be unconstitutionally overbroad if it interferes with "a substantial amount of constitutionally protected conduct," *Hoffman Estates v. Flipside*, 455 U.S. 489, 494 (1982); *New York v. Ferber*, 458 U.S. 747, 771, although "a law should not be invalidated for overbreadth unless it reaches a substantial number of impermissible applications."  The doctrine allows courts to strike down statutes that, even if legitimately applied in some cases, prohibit a substantial amount of protected speech and conduct and chill protected expression.  As the rule has been summarized by the Third Circuit:  "A regulation of speech may be struck down on its face if its prohibitions are sufficiently overbroad—that is, if it reaches too much expression that is protected by the Constitution. The harassment policy can be found unconstitutionally overbroad if 'there is a likelihood that the statute's very existence will inhibit free expression."  *DeJohn v. Temple University*, 537 F.3d 301, 314 (citing *Sypniewski v. Warren Hills Reg'l Bd. of Educ.*, 307 F.3d 243, 258–59 (3d Cir. 2002)).

The Supreme Court has warned many times that declaring a statute facially overbroad is "strong medicine" and should be employed by courts "with hesitation, and then 'only as a last resort." *Broadrick v. Oklahoma*, 413 U.S. at 614. Rather than striking down a statute as facially overbroad, a court should consider whether it is possible to impose a limiting construction on a statute that proscribes protected speech or conduct. *Id.* ("Facial overbreadth has not been invoked when a limiting construction has been or could be placed on the challenged statute.").

The doctrine does not apply to commercial speech. *Hoffman Estates*, 455 U.S. 489. The doctrine is also "limited with respect to conduct-related regulation." *New York v. Ferber*, 458 U.S. 747, 766 (1982) (citing *Broadrick*, 413 U.S. 601); *Broadrick*, 413 U.S. at 615 ("particularly where conduct and not merely speech is involved, we believe that the overbreadth of a statute

must not only be real, but substantial as well, judged in relation to the statute's plainly legitimate sweep.").

Rule 204 is not substantially overbroad. As discussed above the rule serves a legitimate interest, and Rule 204 only implicates First Amendment concerns to a limited extent. There is some level of First Amendment protection for the speech of lawyers practicing law, but practicing law is a mixture of advocacy, commercial speech, and conduct. States' rules for licensing attorneys to practice regulate a great deal more than pure speech.  As described by the Supreme Court *Ohralik v. Ohio State Bar Ass'n*:

> A lawyer's procurement of remunerative employment is a subject only marginally affected with First Amendment concerns. It falls within the State's proper sphere of economic and professional regulation. … While entitled to some constitutional protection, appellant's conduct is subject to regulation in furtherance of important state interests.

436 U.S. 447, 459 (1978). If a professional regulation dictates what licensed practitioners must or must not say, it raises serious constitutional concerns. *Lowe v. S.E.C.* 472 U.S. 181, 228 (1985); *King v. Governor of the State of New Jersey*, 767 F.3d 216, 229 (3d Cir. 2014). But that is not the function of Rule 204. At worst, Rule 204 only makes it more difficult for some practitioners to be fully admitted to practice in Pennsylvania.  That limitation is significantly offset by the ability to seek admission *pro hac vice* which is liberally granted in Pennsylvania. *See* 231 Pa. Code § 1012.1 ("The court shall grant the motion [for *pro hac vice* admission] unless the court, in its discretion, finds good cause for denial").  The Rule's impact on protected speech is minimal. *Locke v. Shore*, 634 F.3d 1185, 1191–92 (11th Cir. 2011) (a licensing requirement for interior decorators "is a professional regulation with a merely incidental effect on protected speech."). The 'medicine' of declaring the Rule 204 facially overbroad is, in this case, too strong by far.

Defendants' Motion for Summary Judgment as to Plaintiffs' claim that Rule 204 is unconstitutionally overbroad is granted.

### b.  Prior Restraint

Laws that require a person or group to acquire a license before speaking and give the government discretion over whether to grant the license risk empowering government officials to censor speech. *City of Lakewood v. Plain Dealer Pub. Co.*, 486 U.S. 750, 757 (1988) ("a licensing statute placing unbridled discretion in the hands of a government official or agency constitutes a prior restraint and may result in censorship."). Such prior restraints on expression are presumed invalid. *Carroll v. President and Com'rs of Princess Anne*, 393 U.S. 175, 181 (1968) ("a system of prior restraints of expression comes to this Court bearing a heavy presumption against its constitutional validity") (citing *Bantam Books v. Sullivan*, 372 U.S. 58, 70 (1963), and *Freedman v. State of Maryland*, 380 U.S. 51, 57 (1965)).

Plaintiffs contend that Rule 204 is one such unconstitutional prior restraint. According to Plaintiffs, the bar exam is a poor measure of whether a person is really qualified to perform all the functions of a competent attorney. The frailties of the exam mean for the Plaintiffs that Rule 204 "is equivalent in this 21st Century to the licensing of printing presses in the 16th and 17th Centuries." Under that system printing a work required approval of a royal censor.[8] Plaintiffs take the position that requiring experienced lawyers to take a bar exam instead of allowing them admission on motion similarly subjects lawyers to government officials' unregulated discretion.

Plaintiffs' analogy is not convincing. To strike down a law as an unconstitutional prior restraint, the law under scrutiny must at least require government approval before engaging in

---

[8] For a discussion of the historical origins of the First Amendment, see William T. Mayton, *Toward a Theory of First Amendment Process: Injunctions of Speech, Subsequent Punishment, and the Costs of the Prior Restraint Doctrine* 67 Cornell L.Rev. 245 (1982).

speech, and the law must give the government discretion to grant or deny the approval. *Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546, 554 (1975) (City's refusal to issue permit for musical "Hair" unconstitutional because denial was "on the basis of its review of the content of the proposed production.") (citing *Cantwell v. Conn.*, 310 U.S. 296 (1940)); *Berch*, 973 F. Supp. 2d at 1106–07 ("a prior restraint exists when the enjoyment of protected expression is contingent upon the approval government officials."), *aff'd* 2014 WL 6871577 (9th Cir. 2014). As discussed above, while the practice of law involves some degree of protected expression, Rule 204 regulates a significant amount of speech and conduct by lawyers that receives less or no First Amendment protection. For example, compare Rule 204 to the regulatory scheme at issue in *Lakewood*, a case on which plaintiffs rely. There, a regulatory scheme required newspapers to apply annually for licenses to distribute papers in news racks in public spaces. *Lakewood*, 486 U.S. at 753. The court noted that one of the features of the regulations that caused it concern was "that it is directed narrowly and specifically at expression or conduct commonly associated with expression: the circulation of newspapers." *Lakewood*, 486 U.S. at 760. Rule 204, in contrast, relates to lawyers' ability to represent clients' interests in Pennsylvania courts, and it does not ban lawyers from nonreciprocal states from gaining admission to the Pennsylvania bar. It simply requires them to take the same exam that any nonlawyer must take. Therefore I have strong doubts that Rule 204 actually serves as a restraint on protected expression.

Furthermore, Rule 204 does not give government officials "unbridled discretion" to deny bar admission to lawyers from nonreciprocal states. For experienced lawyers practicing in states with reciprocity agreements, the rule permits admission by motion. Others must take the bar exam. The concern which lies at the heart of the doctrine of prior restraint is the threat of

censorship, particularly content-based censorship, and I do not see opportunities for censorship in the operation of Rule 204.

Defendants' Motion for Summary Judgment as to Plaintiffs' claim that Rule 204 is an unconstitutional prior restraint is granted.

### c.   Content and viewpoint discrimination

Plaintiffs' next argument is that Rule 204 is unconstitutional because it permits discrimination against expression on the basis of the content and viewpoint of the expression. Plaintiffs propose two mechanisms through which Rule 204 empowers content and viewpoint based discrimination. First, Rule 204 permits some lawyers—lawyers from reciprocity states—to gain admission by motion and speak in Pennsylvania courts but denies that right to others. This discrimination among speakers is invalid, according to Plaintiffs. Second, lawyers can be admitted from nonreciprocal states if they are registered as corporate counsel or a legal services attorney.  Plaintiffs suggest that the specialized areas on which such lawyers focus necessarily embody some particular "content," which Rule 204 improperly favors.

With regard to Plaintiffs' argument that Rule 204 discriminates because it treats lawyers differently, I am persuaded by the Supreme Court's rejection of a similar argument in *Turner Braodcasting System, Inc. v. FCC*, 512 U.S. 622, 658 (1994). Appellants in that case asserted that all laws favoring one speaker over another should be presumed invalid. The Court countered that its case law in fact "stands for the proposition that laws favoring some speakers over others demand strict scrutiny when the legislature's speaker preference reflects a content preference." *Id.* at 658.  Even if  Rule 204 has some impact on lawyers' ability to engage in protected

expression, it still would not be invalid unless it distinguished among speakers based on the content of their speech. This is Plaintiffs' next argument.

Plaintiffs' argument that Pennsylvania admits corporate and legal services lawyers from nonreciprocity states without an exam based on the area of their practice merits deeper analysis. It is true that "government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Young v. American Mini Theaters, Inc.*, 427 U.S. 50, 64 (1976). Laws that restrain speech on the basis of the content or the viewpoint expressed are presumptively invalid: "Discrimination against speech because of its message is presumed to be unconstitutional." *Rosenberger v. Rector and Visitors of University of Virginia*, 515 U.S. 819, 828 (1995).

Case law distinguishes viewpoint discrimination from content-based discrimination, which the latter viewed with a higher degree of suspicion. Viewpoint discrimination involves government actors distinguishing speech based on the speaker's position on a topic, and it is especially antithetical to the First Amendment. *Rosenberger*, 515 U.S. at 829 ("[w]hen the government targets not subject matter, but particular views taken by speakers on a subject, the violation of the First Amendment is all the more blatant."). Content-based discrimination involves government actors distinguishing speech based on its subject matter, but not the viewpoint expressed about the subject matter. *Carey v. Brown*, 447 U.S. 455, 461 (1980) ("[T]he Act accords preferential treatment to the expression of views on one particular subject; information about labor disputes may be freely disseminated, but discussion of all other issues is restricted. The permissibility of residential picketing under the Illinois statute is thus dependent solely on the nature of the message being conveyed.").

Content-based discrimination can be justified in limited circumstances. Discriminatory rules may only be justified if the state can show it has a compelling interest in the law and that the law is narrowly tailored to advance that interest. *Startzell v. City of Philadelphia*, 533 F.3d 183, 193 (3d Cir. 2008).

Rule 204 certainly does not discriminate among lawyers on the basis of their viewpoint. There is no evidence that Pennsylvania even has any information about any lawyers' viewpoints on any particular topic when they apply for admission to the bar. I also find that Rule 204 does not unconstitutionally discriminate on the basis of content. First, I note that a prerequisite for a claim of content-based exclusion has not been satisfied. Lawyers in nonreciprocal states are not excluded from gaining admission to the bar in Pennsylvania. They can take the exam. Second, Rule 204 does not discriminate among lawyers on the basis of the content of their protected expression. The rules that allow in-house counsel and legal services attorneys to practice without taking the bar exam relate to the nature of their working relationships, not the content of any protected expression in which they may engage.  Furthermore, *pro hac vice* status is available for other out-of-state lawyers. These rules are not content-based discrimination, they are content-neutral components of a licensing scheme that Pennsylvania has a legitimate interest in enforcing. *Leis*, 439 U.S. at 443 (states may legitimately forbid out of state lawyers from practicing in the state without meeting the local bar admission requirements).

Defendants' Motion for Summary Judgment as to Plaintiffs' claim that Rule 204 unconstitutionally discriminates on the basis of the viewpoint or content of expression is also granted.

### d.  Compelled Association

Plaintiffs take the position that Rule 204 violates the constitutional right to freedom of association because it punishes lawyers for associating with nonreciprocal states and compels them to associate with reciprocal ones. Plaintiffs contend that Rule 204 withholds a benefit— admission to the Pennsylvania bar—from lawyers based on their association with a disfavored group—a non-reciprocal state—and that the policy is therefore unconstitutional.

The Plaintiffs are correct that the Constitution protects the right to association. The Supreme Court in *Roberts v. Jaycees*, 468 U.S. 609, 617 (1984), explained that courts protect associational liberties "in two distinct senses." First, the Constitution prevents the government from interfering with "certain intimate human relationships […] because of the role of such relationships in safeguarding the individual freedom that is central to our constitutional scheme." *Id.* Second, the Constitution protects "a right to associate for the purpose of engaging in those activities protected by the First Amendment—speech, assembly, petition" and others.  *Id.*  In *Jaycees*, the Supreme Court analyzed and upheld challenged legislation, which required a club to accept female members, through both approaches.

Regarding whether Rule 204 infringes a constitutionally protected intimate relationship, I am aware of no cases, and plaintiff cites to none, that hold a lawyer has a protected intimate relationship with the state of his or her bar admission.[9]  Close relationships that courts have recognized as protected from government intrusion include marriage, childbirth, education of children, and cohabitation with relatives. *Id.* at 620. In contrast, a state may enforce a law compelling a union to accept members without regard to race, color or creed (*Railway Mail*

---

[9] Nor can I imagine such a holding.  The law may be described as a "jealous mistress," but the state of one's bar admission is hardly a defining characteristic of one's personal identity.

*Ass'n v. Corsi*, 326 U.S. 88, 94 (1945)) or similar law as applied to a civics and social club with broad membership. *Jaycees*, 468 U.S. at 621.

There is a marginally stronger— though ultimately unsuccessful—argument that Rule 204 infringes the right to association for the purpose of engaging in protected activities such as speech or petitioning government. Interfering with this form of the right to association can involve the imposition of penalties or the withholding of benefits "because of … membership in a disfavored group." *Jaycees*, 468 U.S. at 622 (citing *Healy v. James*, 408 U.S. 169, 180–84 (1972)). In *Healy*, a college denied recognition to a student group on the basis of the group's political beliefs. 408 U.S. at 183. The Court found that denying recognition prevented the group from fully participating in the campus community. *Id.* at 181.  Plaintiffs here contend that lawyers practicing in nonreciprocal states are similarly prohibited from joining Pennsylvania's bar by motion because of their "association" with a nonreciprocal state.

I find that Rule 204 does not violate this aspect of the right to association. First, as discussed above, "A lawyer's procurement of remunerative employment is a subject only marginally affected with First Amendment concerns."  *Ohralik,* 436 U.S. at 459.  I cannot see how joining a particular state's bar can be considered association in any meaningful sense "for the purpose of engaging in those activities protected by the First Amendment—speech, assembly, petition." *Jaycees*, 468 U.S. at 617.  The Third Circuit rejected a fraternity's claim that its host university violated its associative rights, in part because although "almost any government sanction could be characterized as having *some* indirect effect on First Amendment activities … , indirect and attenuated effects on expression do not rise to the level of a constitutional violation." *Pi Lambda Phi Fraternity, Inc. v. Univ. of Pittsburgh*, 229 F.3d 435,

438–39 (3d Cir. 2000).  Any impact of Rule 204 on lawyers' ability to engage in protected expression and association is highly at best indirect and highly attenuated.

Furthermore, the rule does not prevent lawyers who practice in nonreciprocal states from joining the Pennsylvania bar, or associating with members of the Pennsylvania Bar through *pro hac vice* admission.  It simply requires them to take the same test that every applicant other than lawyers from reciprocal states must take.

Defendants' Motion for Summary Judgment as to Plaintiffs' claim that Rule 204 violates lawyers rights of association is granted.

### e.   Right to Petition

The Petition Clause of the First Amendment "protects the right of individuals to appeal to courts and other forums established by the government for resolution of legal disputes." *Borough of Duryea, Pa. v. Guarnieri*, 131 S. Ct. 2488, 2494, 180 L. Ed. 2d 408 (2011) ("[T]he right of access to courts for redress of wrongs is an aspect of the First Amendment right to petition the government.") (citing *Sure–Tan, Inc. v. NLRB,* 467 U.S. 883, 896–897 (1984)).

One form of petition that the clause protects is the right to litigate:

> Petitions to the courts and similar bodies can likewise address matters of great public import. In the context of the civil rights movement, litigation provided a means for "the distinctive contribution of a minority group to the ideas and beliefs of our society." *NAACP v. Button*, 371 U.S. 415, 431, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963). Individuals may also "engag[e] in litigation as a vehicle for effective political expression and association, as well as a means of communicating useful information to the public." *In re Primus*, 436 U.S. 412, 431, 98 S.Ct. 1893, 56 L.Ed.2d 417 (1978). Litigation on matters of public concern may facilitate the informed public participation that is a cornerstone of democratic society. It also allows individuals to pursue desired ends by direct appeal to government officials charged with applying the law.

*Guarnieri*, 131 S. Ct. 2488 at 2500.

While litigating *as a party* is protected by the Petition Clause, I am aware of no authority that litigating *as a lawyer* on behalf of another party receives the same protection.

Defendants' Motion for Summary Judgment as to Plaintiffs' claim that Rule 204 violates the right to petition is granted.

## VIII.   Equal Protection

The Equal Protection analysis is no different from my analysis of whether Rule 204 violates the Privileges and Immunities Clause of the Fourteenth Amendment. *Connelly*, 706 F.3d at 213 ("We review both of Connelly's [equal protection and right to travel interstate] claims under the same standard because 'the right to interstate travel finds its most forceful expression in the context of equal protection analysis.") (quoting *Schumacher* at 965 F.2d at 1266). For the reasons discussed above, Rule 204 is subject only to rational basis scrutiny, and the rule has a rational relationship to a legitimate state interest. Rule 204 does not violate the Equal Protection Clause of the Fourteenth Amendment.

## IX.   Conclusion

This decision only examines the constitutionality of Rule 204, not the wisdom of the policy. Plaintiffs marshal substantial evidence that preventing experienced lawyers from gaining admission to additional state bars is an outdated policy that ignores the modern realities of legal practice and limits the choices of consumers of legal services. For example, Plaintiffs point out that the American Bar Association recommends that states grant admission by motion for experienced lawyers without regard to whether other states grant reciprocal admission. Plaintiffs'

Motion for Summary Judgment 8 (citing ABA Multijurisdictional Practice Commission (2002) and ABA Commission on Ethics 20/20 (2012)).

However, the Constitution does not mandate that states adopt the best polices. It requires only that states do not stray too far from fundamental principles that define the proper bounds of governmental power.  In this case Pennsylvania has not exceeded its authority.

For the forgoing reasons, Plaintiffs' Motion for Summary Judgment is denied, and Defendants' Motion for Summary Judgment is granted.


_____ /s/ Gerald Austin McHugh
United States District Court Judge

41